Corinne Chandler, - State Bar No. 111423
 E-mail: cchandler@kantorlaw.net
Andrew M. Kantor – State Bar No. 303093
 E-mail: akantor@kantorlaw.net
KANTOR & KANTOR, LLP
19839 Nordhoff Street
Northridge, CA 91324
Telephone: (818) 886-2525
Facsimile: (818) 350-6272

Attorneys for Plaintiff,
La Chanda Webb

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA CHANDA WEBB, | CASE NO. |
| Plaintiff, | BREACH OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974; ENFORCEMENT AND CLARIFICATION OF RIGHTS; BREACH OF FIDUCIARY DUTIES; REQUEST FOR PREJUDGMENT AND POSTJUDGMENT INTEREST; AND ATTORNEYS' FEES AND COSTS |
| vs. | |
| UNUM LIFE INSURANCE COMPANY OF AMERICA, | |
| Defendant. | |

Plaintiff, La Chanda Webb, herein sets forth the allegations of her Complaint against Defendant UNUM Life Insurance Company of America.

PRELIMINARY ALLEGATIONS

1.      "Jurisdiction" – This action is brought under 29 U.S.C. §§ 1132(a), (e), (f) and (g) of the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA") as it involves a claim by Plaintiff for employee benefits under an employee benefit plan regulated and governed under ERISA. Jurisdiction is predicated under these code sections as well as 28 U.S.C. § 1331 as this action involves a federal question. This action is brought for the purpose of recovering benefits under the terms

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

of an employee benefit plan, enforcing Plaintiff's rights under the terms of an employee benefit plan, and to clarify Plaintiff's rights to future benefits under the employee benefit plan named as a Defendant. Plaintiff seeks relief, including but not limited to, payment of the correct amount of benefits due her under her plan, prejudgment and post judgment interest, reinstatement to the benefit plan at issue herein, and attorneys' fees and costs.

2.      Plaintiff was at all times relevant, an employee of Ziffren Brittenham LLP and is currently a resident in the County of Los Angeles, State of California.

3.      Plaintiff is informed and believes that Defendant UNUM Life Insurance Company of America ("UNUM") is a corporation with its principal place of business in the State of Maine, authorized to transact and transacting business in the Central District of California and can be found in the Central District of California.

4.      Plaintiff is informed and believes that Ziffren Brittenham LLP Long Term Disability Plan ("LTD Plan") is an employee welfare benefit plan regulated by ERISA, established by Ziffren Brittenham LLP under which Plaintiff is and was a participant, and pursuant to which Plaintiff is entitled to Long Term Disability ("LTD") benefits. Pursuant to the terms and conditions of the LTD Plan, Plaintiff is entitled to LTD benefits for the duration of Plaintiff's disability, for so long as Plaintiff remains disabled as required under the terms of the LTD Plan. The LTD Plan is doing business in this judicial district, in that it covers employees residing in this judicial district.

5.      Plaintiff is informed and believes that UNUM is the insurer of benefits under the LTD Plan, Policy Number 586091001, and acted in the capacity of the plan insurer and plan claims administrator. In its capacity as claims administrator under the Plan, Unum, at all times material hereto was a true fiduciary with a duty of loyalty to plaintiff herein.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

6.    Plaintiff is informed and believes that Policy Number 586091001 was issued with the intent to provide long term disability coverage to residents of the State of California.

7.    Plaintiff is informed and believes that the Policy was in effect after January 1, 2012. The policy had a contract year from January 1, 2011 to December 31, 2011.

8.    The Policy was renewed after January 1, 2012.

9.    Plaintiff is informed and believes that the Policy had an anniversary date after January 1, 2012.

## FIRST CLAIM FOR RELIEF
### AGAINST UNUM LIFE INSURANCE COMPANY OF AMERICA FOR PLAN BENEFITS, ENFORCEMENT AND CLARIFICATION OF RIGHTS, PREJUDGMENT AND POSTJUDGMENT INTEREST, AND ATTORNEYS' FEES AND COSTS (29 U.S.C. § 1132(a)(1)(B))

10.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

11.    At all times relevant, Plaintiff was employed by Ziffren Brittenham LLP and was a covered participant under the terms and conditions of the LTD Plan.

12.    During the course of Plaintiff's employment, Plaintiff became entitled to benefits under the terms and conditions of the LTD Plan. Specifically, while Plaintiff was covered under the LTD Plan, Plaintiff suffered a disability rendering Plaintiff disabled as defined under the terms of the LTD Plan.

13.    Plaintiff ceased working completely as of March 5, 2019, due to impairing fatigue, pain, and cognitive impairment due to a myriad of conditions, including but not limitation to Fibromyalgia, Chronic Fatigue Syndrome, and  Cognitive Impairment.

14.    Her elimination period would have ended, and thus her entitlement to benefits started, on June 2, 2019.

15.    Pursuant to the terms of the LTD Plan, Plaintiff made a claim to UNUM for LTD benefits under the LTD Plan. UNUM assigned Plaintiff Claim Number: 16491697.

16.    UNUM denied Plaintiff's claim on December 11, 2019. In its denial, UNUM highlighted several purported "imperfections" of Ms. Webb's claim. A true and correct copy of the December 11, 2019, denial described in this paragraph is attached hereto as Exhibit A, at pages 3-4. Included among them was UNUM's assertion that Plaintiff allegedly ignored a recommendation that she obtain neuropsychological testing; implying that plaintiff's lack of treatment was evidence that plaintiff was not impaired. In particular, UNUM highlighted this alleged failure by Plaintiff for the purpose of supporting its argument that "... the intensity of the management of your condition does not support [your disability claim]."

17.    As a fiduciary, with a duty of loyalty to Plaintiff, Unum was required to comply with the claim procedures specified in 29 C.F.R. 2560.503-1(4)(h)(ii), and to notify plaintiff  in advance of the final decision on appeal of new or additional rationale adjudicate the claim in a manner.

18.    As a fiduciary, with a duty of loyalty to Plaintiff, Unum was required to engage in a meaningful dialogue with plaintiff and to advise her that if it required certain evidence to prove an entitlement to benefits.  If in its judgment, Unum determined that specific evidence was required to prove an entitlement to benefits, Unum was under a duty to advise plaintiff of this fact prior to the final decision on appeal.

19.    As a fiduciary, with a duty of loyalty to plaintiff, Unum was required to implement and utilize "fair claims procedures" such as those specified in 29 C.F.R. 2560.503-1(g)(iii). Said fair claims procedures include the requirement that in a denial letter, an administrator is required to provide "a description of any additional material

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

4

or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary…"

20.     Plaintiff is informed and believes that the requirement embodied in 29 C.F.R. 2560-1(g)(iii) is also included in the Plan.

21.     Plaintiff timely appealed on June 24, 2020.

22.     UNUM denied Plaintiff's appeal on September 16, 2020. Of note, UNUM indicated (for the first time) that neuropsychological testing "would be *expected* in a setting of concerns of cognitive deficits." [emphasis added]. Unum did not advise plaintiff prior to the final decision on appeal that it expected neuropsychological testing to grant her claim.

23.     On March 11, 2021, Plaintiff attempted to submit evidence which UNUM identified in the denial letter as being relevant to her claim, including neuropsychological testing. A true and correct copy of the March 11, 2021, appeal letter described in this paragraph is attached hereto as Exhibit B.

24.     Plaintiff is informed and believes that Unum has Claims Procedure which specifies that if an appeal has already been completed for a claim, any subsequent correspondence should be included in the claim file.  Said Claims Procedure specifies that claims personnel have authority to consider a post appeal submission.  Said Claims Procedure further specifies that a post appeal submission should be considered if the appeal concluded that additional information was necessary to reach a decision.  As a fiduciary, with a duty of loyalty, Unum should have exercised its authority and performed its duty in the interests of Plan participants, including plaintiff herein, and not to suit its own financial interests.  A true and correct copy of the Claims Procedure described in this paragraph is attached hereto as Exhibit C.

25.     Within the letter dated March 11, 2021, Plaintiff explained to UNUM why it should consider this evidence. First, it is within the scope and duties of its obligations as a fiduciary to review such information. Second, UNUM failed to engage in a

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

meaningful dialogue in connection with the denial of her claim in order for Ms. Webb to ascertain what UNUM believed was needed to perfect the claim.

26.     Four days after plaintiff submitted the evidence, UNUM responded to Plaintiff's request that it consider information with an outright rejection. Instead of meaningfully considering the evidence, Unum stated that there were "no more administrative appeals available and the appeal is closed." This lawsuit followed.

27.     As stated above, Unum's denial on appeal conveyed to plaintiff that it "expected" in a setting involving cognitive deficits. Under the terms of the Policy, Unum had the right to request that plaintiff undergo cognitive testing or other testing, yet it declined to do, almost certainly based on its belief that such evidence would have helped clarify any issues that acted as an impediment to the approval of her claim.

28.     Defendant UNUM breached the Plan and violated ERISA in the following respects:

(a)     It failed to pay LTD benefit payments to Plaintiff at a time when Defendants knew, or should have known, that Plaintiff was entitled to those benefits under the terms of the LTD Plan, as Plaintiff was disabled and unable to work and therefore entitled to benefits;

(b)     It failed to provide a prompt and reasonable explanation of the basis relied on under the terms of the LTD Plan documents, in relation to the applicable facts and LTD Plan provisions, for the denial of Plaintiff's claims for LTD benefits;

(c)     It failed, after Plaintiff's claim was denied, to adequately describe to Plaintiff any additional material or information necessary for Plaintiff to perfect her claim along with an explanation of why such material is or was necessary;

(d)     It failed to properly and adequately investigate the merits of Plaintiff's disability claim;

       (e)     It failed to provide a full and fair review of the appeal of the denial of Plaintiff's claim.

29.    Plaintiff is informed and believes and thereon alleges that Defendants wrongfully denied her disability benefits under the LTD Plan by other acts or omissions of which Plaintiff is presently unaware, but which may be discovered in this future litigation and which Plaintiff will immediately make Defendants aware of once said acts or omissions are discovered by Plaintiff.

30.    Following the denial of benefits under the LTD Plan, Plaintiff exhausted all administrative remedies required under ERISA, and Plaintiff has performed all duties and obligations on Plaintiff's part to be performed under the LTD Plan.

31.    As a proximate result of the aforementioned wrongful conduct of the LTD Plan and UNUM, and each of them, Plaintiff has damages for loss of disability benefits in a total sum to be shown at the time of trial.

32.    As a further direct and proximate result of this improper determination regarding Plaintiff's LTD claim, Plaintiff, in pursuing this action, has been required to incur attorneys' costs and fees. Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiff is entitled to have such fees and costs paid by Defendants.

33.    The wrongful conduct of the LTD Plan and UNUM has created uncertainty where none should exist, therefore, Plaintiff is entitled to enforce her rights under the terms of the LTD Plan and to clarify her right to future benefits under the terms of the LTD Plan.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

**SECOND CLAIM FOR RELIEF**
**AGAINST DEFENDANT FOR**
**BREACH OF FIDUCIARY DUTIES, SURCHARGE,**
**INJUNCTIVE RELIEF, PRE-JUDGMENT AND POSTJUDGMENT**
**INTEREST, AND ATTORNEYS' FEES AND COSTS**
**[29 U.S.C. § 1132(a)(3)]**

34.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein. In the alternative to the First Claim for Relief asserted herein, plaintiff alleges as follows:

35.    At all times relevant hereto, Defendant was an ERISA fiduciary who owed Plaintiff a "higher than marketplace" duty to, among other things, ensure that "the claims procedures are . . . not administered in a way [] that duly inhibits or hampers the initiation or processing of claims for benefits," as specified in 29 C.F.R. 2560-503.1. The duty has been described as the "highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1388 (9th Cir. 1996).

36.    Defendant also had a duty to ensure that "benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situations claimants." 29 C.F.R. 2560-503.1(b)(5). Further, "a fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, *even when a beneficiary has not specifically asked for the information*." (Italics added). *Farr v. U.S. West Communications, Inc.*, 151 F.3d 908 (9th Cir. 1998), *citing Barker v. American Mobil Power Corp.*, 64 F.3d 1397, 1403 (9th Cir. 1995).

37.    UNUM violated its fiduciary duties in the following respects:

    a. Failing to disclose and/or abide by its own internal plan guidelines, as
       previously described, which dictate that if new information is
       submitted after the appeal is completed, said information should be

considered. In spite of this procedure, Unum failed and refused to consider the post appeal submission;

b. Failing to comply with the requirement that its adverse benefit determinations contain "a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g)(1)(iii). Said failure prevented plaintiff from understanding that Unum "expected" cognitive testing to prove her claim;

c. Refusing to engage in a meaningful dialogue with plaintiff by providing inaccurate information to Plaintiff in the form of significant omissions and misdirection regarding the evidence UNUM felt was necessary to prove the claim, most notably in regard to the neuropsychological testing described above.

d. Failing to comply with 29 C.F.R. §2560.503-1(4)(h)(ii) by failing to provide plaintiff with the rationale that Unum "expected" to see cognitive testing to prove plaintiff's claim at a time when plaintiff could have provided the evidence "expected" by Unum;

e. Engaging in "self-dealing" by refusing to consider the post appeal information (both during *and* after the formal appeal window had closed), when said refusal benefitted Unum's financial interest, but acted to the detriment of plaintiff. Said refusal by Unum was in breach of its duty of loyalty to act solely in the interests of plan participants and beneficiaries.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

1.    Payment of disability benefits due Plaintiff;

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

2.      An order declaring that Plaintiff is entitled to an award of LTD benefits, and that benefits are to continue to be paid under the LTD Plan for so long as Plaintiff remains disabled under the terms of the LTD Plan;

3.      In the alternative to the relief sought in paragraphs 1 and 2, an order remanding Plaintiff's claim to the claims administrator allow Plaintiff to receive the benefit of the full and fair review to which she was previously deprived;

4.      Pursuant to 29 U.S.C. § 1132(g), payment of all costs and attorneys' fees incurred in pursuing this action;

5.      Payment of prejudgment and post-judgment interest as allowed for under ERISA; and

6.      Such other and further relief as this Court deems just and proper.

DATED:  July 16, 2021                    KANTOR & KANTOR, LLP

By   /s/ Andrew M. Kantor
     Andrew M. Kantor
     Attorney for Plaintiff
     La Chanda Webb

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

# EXHIBIT A

Unum
The Benefits Center
PO Box 100158
Columbia, SC 29202-3158
Phone: **1-800-858-6843**
Fax: **1-800-447-2498**
www.unum.com



December 11, 2019

LACHANDA C WEBB
20324 DOROTHY ST
SANTA CLARITA, CA 91350

RE:     Webb, LaChanda C
        Claim Number:        16491697
        Policy Number:       586091
        Unum Life Insurance Company of America

Dear Ms. Webb:

We have completed our review of your Long Term Disability claim and are unable to approve
your benefits.  Please review this entire letter as it will help you understand how we reached this
decision.

| **Long Term Disability Claim Number:**<br>16491697 | **Contact Us** |
|---|---|
| **Last Day Worked:**<br>March 5, 2019 | **Direct:**<br>Karie Bell<br>1-800-858-6843 extension, 45646 |
| **Date of Disability:**<br>March 5, 2019 the date you did not work a full time | **Call Center:**<br>1-800-858-6843<br>8am - 8pm ET, Mon-Fri |
| **Elimination Period:**<br>90 days during which time benefits are not payable | |
| **Elimination Period End Date:**<br>June 2, 2019 | |

Claimant Name: Webb, LaChanda C
Claim Number: 16491697

December 11, 2019
Page 2 of 6

**Decision/Reason:**

We have determined your records did not support a conclusion that your disability extended beyond June 2, 2019. Therefore, we will not approve your claim.

**Information That Supports Our Decision:**

You filed a claim for disability benefits due to fibromyalgia.  You and your physician told us that this condition prevents you from performing your regular occupational duties. On the attending physician statement, Dr. Dahodwala stated that beginning August 6, 2019 to November 6, 2019, your "fibromyalgia causes chronic fatigue and pain which impairs her from prolonged sitting and critical thinking."

The Long Term Disability policy says your benefits begin after you have been continuously disabled for 90 days. The policy calls this period the elimination period. Since your disability began on March 5, 2019, your elimination period would have ended on June 2, 2019.

To complete our decision on your claim, we needed to understand what the substantial and material acts of your usual occupation were as well as your functional capacity to determine if you continue to meet the definition of disability throughout the elimination period.

A vocational rehabilitation consultant reviewed your file and concluded the substantial and material acts of your usual occupation are light level work requiring exerting up to 20 pounds of force occasionally (up to 1/3 of the time) with changes in position for brief periods throughout the day. It also requires frequent (1/3 to 2/3 of the time) sitting and occasional standing and walking. It requires making judgements and decisions; dealing with people; attaining precise set limits, tolerances, and standards; and performing a variety of duties.

We reviewed the information submitted with your claim as well as your medical records from Dr. Dahodwala and UCLA Medical Center to determine if your medical condition prevented you from performing the substantial and material acts of your usual occupation.  You confirmed that Dr. Dahodwala is the doctor asserting an opinion about your restrictions and limitations.

We had a physician, board certified in family medicine, contact Dr. Dahodwala to inquire about your functional capacity. Dr. Dahodwala responded on December 9, 2019 informing us that he has no opinion regarding your functional capacity as of June 2, 2019.

In addition to inquiring of Dr. Dahodwala about your functional capacity, we had two physicians, both board-certified in family medicine review your file. Both reviewing physicians concluded your records did not support your inability to perform the demands of the substantial and material acts of your usual occupation beyond June 2, 2019. In reaching their conclusions, they noted the following:

- During your June 3, 2019 visit with rheumatologist Dr. Navarro, you reported that Cymbalta was helping, and you were doing Tai Chi. The record also noted that you started blogs and considering finding a new job.
- Your physical exam findings on June 3, 2019 were essentially normal except for upper back, chest and neck pain. Your gait was normal and strength in all major muscle groups were 5/5. Your range of motion was also noted normal.

Claimant Name: Webb, LaChanda C
Claim Number: 16491697

December 11, 2019
Page 3 of 6

- Your visit of July 5, 2019 with rheumatologist Dr. Yu reflects an assessment of reported headaches, brain fog, pain and fatigue. The record noted your report of being burned out.
- Neurologist Ms. Tipirneni recommended on March 8, 2019 that you undergo neuropsychological testing for your reported brain fog, but you did not follow through with the recommendation.

In conclusion, we find the evidence in your medical records including the symptoms you reported to Dr. Navarro on June 3, 2019, the physical exam findings and diagnostic testing documented in the records and the intensity of the management of your condition does not support the conclusion that you remained unable to perform the substantial and material acts of your usual occupation after June 2, 2019. Therefore, we find you did not meet the policy's definition of disability after June 2, 2019. We will not approve your request for Long Term Disability payments, and we have closed your claim.

**Policy Provisions**

We relied upon your employer's policy when making our decision, including provisions listed below, and we reserve our right to enforce other provisions of the policy.

## *HOW DOES UNUM DEFINE DISABILITY?*

### Group 3
**You are disabled when Unum determines that:**

- you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
- you have a **20%** or more loss in your **indexed monthly earnings** due to the same **sickness** or **injury**.

**After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.**

**The loss of a professional or occupational license or certification does not, in itself, constitute disability.**

**We may require you to be examined by a physician, other medical practitioner and/or vocational expert of our choice. Unum will pay for this examination. We can require an examination as often as it is reasonable to do so. We may also require you to be interviewed by an authorized Unum Representative.**

## *HOW LONG MUST YOU BE DISABLED BEFORE YOU ARE ELIGIBLE TO RECEIVE BENEFITS?*

**You must be continuously disabled through your elimination period. Unum will treat your disability as continuous if your disability is due to the same injury or sickness and stops for 180 days or less, per period of recovery, during the elimination period.**

Claimant Name: Webb, LaChanda C
Claim Number: 16491697

December 11, 2019
Page 4 of 6

**Your elimination period is 90 days.**

**The days that you are not disabled will not count toward your elimination period.**

**You are not required to have a 20% or greater loss in your indexed monthly earnings due to the same injury or sickness to be considered disabled during the elimination period.**

**ELIMINATION PERIOD** means a period of continuous disability which must be satisfied before you are eligible to receive benefits from Unum.

The policy also states:

Effective on January 19, 2006, the following changes are being made to your group long term disability or group short term disability California policy(ies) issued by Unum Life Insurance Company of America. In the event of conflicts between the policy language and this endorsement, the terms of this endorsement will prevail over the policy language.

1. The following definition of total disability is added to the policy, and if the policy includes a definition of disability, the term "disability" is revised to include total disability. If the policy already contains a definition of "total disability," that definition is revised as follows. All time periods and other definitions of disability remain and will be applied consistent with the occupational criteria described in this endorsement.

    *You are "totally disabled":*

    *During any period covering a disability for your occupation, own occupation, normal occupation, regular occupation or usual occupation when a disability renders you unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way.*

    *During any period covering a disability from any occupation, any other occupation, any gainful occupation, any other gainful occupation, reasonable occupation, or another occupation when a disability renders you unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way and unable to engage with reasonable continuity in another occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, physical and mental capacity.*

    *"Substantial and material acts" as used in the above definition of disability, means acts that:*

    *- are normally required for the performance of your usual occupation or another occupation; and*
    *- cannot be reasonably omitted or modified.*

    *"Usual occupation" means the substantial and material acts you are routinely performing for your employer when your disability begins.*

## Next Steps Available to You

If you disagree with our decision, you have the right to request an appeal.

## What is an Appeal?

An appeal is your written disagreement with our claim decision and a request for a review of that decision.

Claimant Name: Webb, LaChanda C
Claim Number: 16491697

December 11, 2019
Page 5 of 6

**How do you request an Appeal?**

You will need to submit a written letter of appeal outlining the basis for your disagreement.  To ensure handling of your appeal without delay, please include any additional information you would like considered.  This information may include written comments, documents, or other information in support of your appeal.

**What information is available to you?**

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

**How much time do you have to request an Appeal?**

You have 180 days from the date you receive this letter.

If we do not receive your written appeal within 180 days of the date you receive this letter, our claim determination will be final.

**Where do you mail or fax your written request for an Appeal?**

The Benefits Center
Appeals Unit
PO Box 9548
Portland, ME 04104-5058
Fax Number: 1-207-575-2354

Our Appeals Unit will send you a letter acknowledging receipt of your appeal including your Appeals Specialist's contact information.

**How does the Appeal process work?**

An Appeals Specialist will review your entire claim, including any new information you submitted and may consult medical and vocational experts or other resources.  The Appeal Specialist will make an independent decision on your claim.

**How much time does the Appeal review take?**

We are committed to making an appeal decision within 45 days after we receive your written appeal.  There may be special circumstances in which the review can take longer.  We will notify you if more time is needed.

**What if you continue to disagree with the determination after the appeal is decided?**

You will have the right to have a court review the appeal determination by bringing a civil action under section 502(a) of the Employee Retirement Income Security Act (ERISA).

**To All California Residents and Policyholders**

Claimant Name: Webb, LaChanda C
Claim Number: 16491697

December 11, 2019
Page 6 of 6

To the extent California law applies to your claim, you may also contact the California Department of Insurance if you wish to have them review your claim.

If you wish to write to the Insurance Department, your letter should be addressed to:

California Department of Insurance
Claims Services Bureau
300 South Spring Street, South Tower
Los Angeles, CA 90013

If you wish to contact the Department by telephone, you should ask for the Claims Services Bureau at 1-800-927-HELP (1-800-927-4357) or 213-897-8921 or the TDD Number at 1-800-482-4TDD (1-800-482-4833).

You may also contact the California Department of Insurance at www.insurance.ca.gov.

The policy under which you are insured has a provision which states, in part, that no lawsuit or legal action shall be brought to recover on the policy after 3 years from the date proof of claim is required.

We hope this letter has been clear and helpful to you.  If you have any questions or would like to follow the status of your claim, you can do so conveniently through your secure online account at www.unum.com/claims.

After reviewing your online account, if you have additional questions, please call us.  Our experienced representatives are available to assist you. We will identify your claim by your Social Security number or claim number, so please have one of these available when you call.

| | |
|---|---|
| Spanish: To obtain assistance in Spanish, call 1-800-858-6843. | Para obtener asistencia en Español, llame al 1-800-858-6843. |
| Chinese: To obtain assistance in Chinese, call 1-800-858-6843. | （中文）：如果需要中文的帮助，请拨打这个号码：1-800-858-6843。 |
| Tagalog: To obtain assistance in Tagalog, call 1-800-858-6843. | Kung kailangan ninyo ng tulong sa Tagalog, tumawag sa 1-800-858-6843. |
| Navajo: To obtain assistance in Dine, call 1-800-858-6843. | Dinek`ehgo shika at`ohwol ninisingo, kwiijigo holne` 1-800-858-6843. |

Sincerely,

*Karie Bell*

Karie Bell
Lead Disability Benefits Specialist

# EXHIBIT B

# KANTOR & KANTOR LLP

19839 NORDHOFF STREET ▪ NORTHRIDGE ▪ CA  91324

TEL (818) 886-2525 ▪ FAX (818) 350-6272

WWW.KANTORLAW.NET

Andrew M. Kantor
akantor@kantorlaw.net

March 11, 2021

***Via Fax: 207.575.2354 and***
***Certified Mail – Return Receipt***
Katie Doherty HIA
Lead Appeals Specialist
Unum - Appeals Unit
PO Box 9548
Portland, ME 04104-5058

> RE:   LaChanda C. Webb
>         Claim Number: 16491697
>         Policy Number: 586091
>         Unum Life Insurance Company of America

Dear Ms. Doherty:

As you may be aware, this office now represents LaChanda Webb ("Ms. Webb") in regard to her Long-Term Disability ("LTD") claim with Unum Life Insurance Company of America under the group LTD policy issued to her employer, Ziffren Brittenham LLP ("Ziffren").

This letter and attachments shall constitute Ms Webb's formal request that UNUM consider additional information in relation to her claim and appeal. UNUM should do so because 1) it is within the purview of its fiduciary obligations to Ms. Webb in the context of a *de novo* review, and 2) UNUM's failure to give Ms. Webb a full and fair review necessitates that it review this information now.  Specifically, UNUM should rectify its refusal to acknowledge and/or obtain critical information related to Ms. Webb's claim, most notably neuropsychological testing; the same testing which UNUM noted it would "expect" to see coupled with complaints of cognitive impairment. As such, enclosed with this letter are the following documents we wish to be considered and included as part of the appeal/request for reconsideration: (WEBB APL 1-49):

- Two-Day Cardiopulmonary Evaluation Report prepared by Christopher R. Snell, Ph.D. of Workwell Foundation (November 13, 2020) (WEBB APL 001-020);
- Neuropsychological Evaluation prepared by Steven A. Castellon, Ph.D. of Golden State Neuropsychology (January 24, 2021) (WEBB APL 021-039);

*Katie Doherty HIA*
*March 11, 2021*
*Page 2*

- Medical Opinion of Dr. Geraldine Navarro (October 14, 2020) (WEBB APL 040-048); and
- Declaration of LaChanda Webb (WEBB APL 049).

### *Unum's Denial of Ms. Webb's Claim*

Ms. Webb made a claim for long term disability benefits with a disability date of March 5, 2019. On December 11, 2019, UNUM denied Ms. Webb's initial claim. On September 16, 2020, Unum upheld the denial of Ms. Webb's claim after completion of the administrative review. However, as language from the denial letter clearly highlights, UNUM's claims handling reflects a clear intent to forgo a fair investigation in favor of justifying a pre-determined denial of Ms. Webb's claim. In doing so, UNUM deprived Ms. Webb of a full and fair review in violation of ERISA regulations. For example:

1. UNUM repeatedly chose to disregard supportive evidence in its entirety by identifying comparatively miniscule "flaws" in said evidence. Examples include:
    i. Disregarding examination findings which document myofascial pain because her physician didn't *also* document neurological deficits or musculoskeletal abnormalities, both of which are found on examination in a plethora of other office visits;
    ii. Disregarding the low MOCA score for the sole reason that none of Ms. Webb's *other* physicians performed mental status examinations, despite none of those physicians holding the proper specialty to perform such tests;
    iii. Disregarding all limitations from behavioral health conditions while simultaneously utilizing her mental health history to passive-aggressively cast doubt on the veracity of her physical complaints; and
    iv. Openly disregarding certain medical records because they reflected her condition five months after her date of disability. The fact that UNUM continues to utilize this argument despite it being repeatedly struck down by courts[1] further highlights its flawed reasoning.
2. UNUM failed to send Ms. Webb for a neuropsychological evaluation despite its acknowledgement that she was referred for such testing. Even more egregious, it did so despite its admission in the final denial letter that "Neuropsychology [sic] testing would be expected in a settling of concerns of cognitive deficits." UNUM had the ability and the right to send Ms. Webb for

---

[1] *See Fleming v. UNUM Life Ins. Co. of Am.*, 2*018 WL 6133859 (C.D. Cal., 2018)

such an examination under the Policy in order to "settle" the existence of such deficits. Instead, despite being the only entity that actually required "settling" of her cognitive deficits, UNUM refused to exercise its power to do so.[2]

3. Despite UNUM's admission within the final denial letter (and *only* the final denial letter) of the importance of neuropsychological testing, UNUM did not inform Ms. Webb of its importance when she could still obtain such testing. Instead, it waited until *after* it had denied her claim in final to point out why such testing was not only important, but "expected."

UNUM chose to disregard its fiduciary obligations to Ms. Webb by preventing her from obtaining the evidence she needed to prove her claim. As such, it should voluntarily review the evidence attached herein. Such conduct would be strictly in line with its fiduciary duties to Ms. Webb. Even the conservative Fifth Circuit Court of Appeals has held that claimants have a right to submit evidence to an administrator prior to filing suit, and that evidence will be admitted into the record as long as the administrator has a fair opportunity to consider it. *See Vega v. National Life Insurance Services, Inc.,* 188 F.3d 287, 302 (5th Cir. 1999). Should UNUM refuse to consider this evidence, Ms. Webb will be forced to file a motion to augment the record along with the complaint she intends to file if UNUM upholds its denial.

### *October 14, 2020 Fibromyalgia Evaluation by Dr. Geraldine Navarro*

Rheumatologist Dr. Geraldine Navarro completed a questionnaire explaining the extent of Ms. Webb's limitations. She noted, for example:
- Ms. Webb meets the 1990 American College of Rheumatology Criteria for Fibromyalgia;
- More than 11 of 18 tender points have been identified on examination;
- Ms. Webb also suffers from debilitating fatigue and post-exertional malaise;
- Ms. Webb suffers from severe pain, brain fog, and chemical sensitivity;
- Ms. Webb is incapable of any type of work, including "low stress" work.

### *January 7, 2021 Neuropsychological Report*

On November 24, 2020, Ms. Webb underwent neuropsychological testing with neuropsychologist Dr. Steven Castellon. Dr. Castellon concluded, in part:

[2] Ms. Webb never received the referral, most likely due to a clerical error, and was unable to afford such testing on her own. The only way she could have obtained such testing at the time was if UNUM had obtained it.

*Katie Doherty HIA*
*March 11, 2021*
*Page 4*

*CONCLUSIONS REGARDING DISABILITY*
*Scores on the current neuropsychological evaluation show deficits in areas of information processing speed, effort full attention (especially sustained attention), and learning and memory. Scores in these areas stand in stark intellectual functioning and high premorbid IQ (estimates in the High Average range). In my professional opinion, these cognitive issues make it highly unlikely that she could successfully return to the work she was doing as a lead paralegal in a top end law firm. In addition to the marked slowing of information-processing speed and deficits in bother her sustained and divided attention, her lack of efficiency learning new information when it is initially presented (i.e. first-trial learning) makes it hard to imagine what higher-level cognitive activities she could successfully execute during a typical work day (and she noted that 10-hour days were routine). From review of her medical records, it is clear that pain, migraines, fatigue, and malaise have all been present for several years now. Given the neurocognitive findings on testing, as well as Dr. Snell's CPET findings (abnormal metabolic, recovery, pulmonary findings), I believe that she is totally disabled.*

**November 12, 2020 2-Day Cardiopulmonary Exercise Test**

On October 26 and 27, 2020, Ms. Webb underwent a two-day cardiopulmonary exercise test. The test revealed that Ms. Webb

*. . .demonstrates cardiopulmonary anomalies\*, low function and delayed recovery with severe symptom exacerbation post-exertion. This will severely limit her ability to engage in normal activities of daily living and precludes employment of even a sedentary/stationary nature.*
*\*Treating physician please take note.*

**Conclusion**

This letter further serves to confirm that Unum intends to provide our office with copies of any adverse reports prior to rendering a final determination. As a reminder, Unum is required to provide such reports according to binding 9th Circuit precedent. See *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011). See also *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863 (9th Cir. 2008). And see also, Department of Labor Regulatory Rules and Regulations regarding Claims Procedure for Plans Providing Disability Benefits: 29 CFR Part 2560 RIN 1210-AB39, Federal Register Vol. 81, No. 243 December 19, 2016. Specifically, we call your

*Katie Doherty HIA*
*March 11, 2021*
*Page 5*

attention to section 2560.503-1 of the Final Rule enacted April 3, 2018, which concludes that claims procedures provide that:

> before the plan can issue an adverse benefit determination on review on a disability benefit claim, the plan administrator shall provide the claimant, free of charge, with any new or additional evidence considered, relied upon, or generated by the plan, insurer, or other person making the benefit determination (or at the direction of the plan, insurer or such other person) in connection with the claim; such evidence must be provided as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided…to give the claimant a reasonable opportunity to respond prior to that date; and (ii) Provide that, before the plan can issue an adverse benefit determination on review on a disability benefit claim based on a new or additional rationale, the plan administrator shall provide the claimant, free of charge, with the rationale; the rationale must be provided as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided…to give the claimant a reasonable opportunity to respond prior to that date.

The Final Rule goes on to state:

> "The objective of these provisions is to ensure the claimant's ability to obtain a full and fair review of denied disability claims by explicitly providing that claimants have a right to review and respond to new or additional evidence or rationales developed by the plan during the pendency of the appeal, as opposed merely to having a right to such information on request only after the claim has already been denied on appeal, as some courts have held under the Section 503 Regulation. These protections are direct imports from the ACA Claims and Appeals Final Rule, and they would correct procedural problems evidenced in litigation even predating the ACA. It was and continues to be the view of the Department that claimants are deprived of a full and fair review, as required by section 503 of ERISA, when they are prevented from responding, at the administrative stage level, to all evidence and rationales.

If Unum does not intend to provide such reports prior to the issuing of an adverse determination, please let our office know immediately.

*Katie Doherty HIA*
*March 11, 2021*
*Page 6*

Further, we request that Unum clarify whether our client is entitled and/or required to submit a second appeal should the decision to terminate her benefits be denied as a result of the current appeal.

***Furthermore, due to the potential inaccuracies of the reporting of statements made during telephone conversations, if Unum employees or its agents, including physician records reviewers, wish to communicate with Ms. Webb's treating or examining doctors, we insist that the communications be in writing.***

We remind you that because we represent Ms. Webb, all other correspondence concerning her disability should be made with this office only.  Should you have any questions regarding this matter, please do not hesitate to contact the undersigned.

Very truly yours,

Andrew M. Kantor

*Enclosures*



P.O. Box 1435
Ripon, CA 95366
☎ (209) 599-7194
🖷 (209) 599-4047



# Cardiopulmonary Exercise Test (CPET) Evaluation Report

**Name:** La Chanda Webb
**Date:** November 13, 2020
**CPET Dates:**   October 26, 2020; Test 1
   October 27, 2020; Test 2

**Findings:**

**Ms. Webb demonstrates cardiopulmonary anomalies\*, low function and delayed recovery with severe symptom exacerbation post-exertion. This will severely limit her ability to engage in normal activities of daily living and precludes employment of even a sedentary/stationary nature.**

***\*Treating physician please take note.***

**Indications:**

The patient was referred to our lab for global functional evaluation examining metabolic, cardiovascular and pulmonary function after experiencing physical stress. Ms. Webb underwent a cardiopulmonary exercise test-retest over a two-day period. She is 49 years-old, 63 inches tall and weighs 167.4 pounds.



FISCALLY SPONSORED BY
united
CHARITABLE
A registered 501(c)3 non-profit organization #20-4286082

WEBB APL - 001

La Chanda Webb

**Procedure:**

The patient performed symptom limited 15 W/min ramping protocols on a bicycle ergometer while expired gases were collected for determination of oxygen consumption, carbon dioxide production and pulmonary ventilation. Two exercise tests were performed on consecutive days. The heart rate, blood pressure and arterial oxygen saturation were assessed throughout the tests. Appropriate measures were taken to calibrate and test the accuracy and reliability of the testing equipment on both days. These tests were performed to determine functional capacity and assess the recovery response to a standardized physical stressor.

In the fields of exercise science and medicine, cardiopulmonary exercise testing (CPET) is considered the gold standard for measuring and evaluating functional capacity and fatigue. Position statements and/or guidelines for the performance of this testing are available from the American College of Sports Medicine, American Heart Association, American College of Chest Physicians, American Thoracic Society and the American Medical Association, among others. All endorse this method of testing and acknowledge peak oxygen consumption, only available with CPET, as the most accurate measurement of functional capacity. Workwell Foundation has adopted this standardized, reliable and accurate tool to evaluate disability in fatigue-related disorders.

La Chanda Webb

**Conclusions:**

1) <u>Assessment of Effort</u>: **Normal**
   The patient was cooperative and there is no evidence of malingering. Respiratory exchange ratio (RER) and rating of perceived exertion (RPE) values met criteria for maximal effort on both tests. Cardiopulmonary exercise testing provides objective measures that can clearly distinguish between indolence and true disability. See page 4, #1 <u>Assessment of Effort</u>.

2) <u>Metabolic Responses</u>: **Abnormal**
   Peak oxygen consumption was only 71-77% of predicted and below the 17.5 $ml \cdot kg^{-1} \cdot min^{-1}$ Social Security Administration criteria for disability in cases of cardiovascular disease. Measured values for oxygen consumption at the ventilatory/anaerobic threshold indicate severe to moderate disability using the Weber/New York Heart Association criteria. The prognosis for patients at this level of function includes a marked limitation of physical activity. Less than ordinary activity causes fatigue, tremors, shortness of breath, or chest pain. See page 4, #2 <u>Metabolic Responses</u>.

3) <u>Workload</u>: **Abnormal**
   Submaximal workload of 34 to 35 watts equates only to light housework activities such as ironing or cooking which range from 35 to 44 watts. See page 4, #3 <u>Work in Watts</u>.

4) <u>Cardiovascular Responses</u>: **Abnormal**
   See Respiratory Response below. See page 5, #4 <u>Cardiovascular Responses</u>.

5) <u>Respiratory Responses</u>: **Abnormal**
   Some values for exhaled carbon dioxide, were marginally outside of normal parameters, i.e., $PetCO_2$ <40 mmHg, $VE/VCO_2$ >30. This may show impaired ventilatory efficiency and chronic metabolic acidosis. Low exhaled $CO_2$ levels can result from cardiovascular disease, and/or pulmonary disease and have been linked to orthostatic hypocapnia. See page 5, #5 <u>Respiratory Responses</u>.

6) <u>Recovery Response</u>: **Abnormal**
   A recovery time of 24 hours or less and minor muscle soreness is considered normal following exercise testing. This patient's recovery time of 7+ days along with excessive fatigue and symptom exacerbation should be considered an extreme reaction to physical activity. See page 5, #6 <u>Recovery Response</u>.

4

La Chanda Webb

**Results:**

1. <u>Assessment of Effort</u>

    The American Heart Association cite peak respiratory exchange ratio (RER) as the most accurate and reliable gauge of subject effort during cardiopulmonary exercise testing. A peak RER ≥1.10 is generally considered an indication of excellent patient effort. An RER between 1.0 and 1.09 indicates good effort.

| Test Criteria | Test 1 | Test 2 |
|---|---|---|
| RER ≥ 1.10 | 1.35 | 1.22 |
| RPE ≥ 17 | 19 | 20 |

RER – Respiratory Exchange Ratio
RPE – Rate of Perceived Exertion

2. <u>Metabolic Responses</u>

| Peak Values | Oxygen Consumption (mL/min) | Oxygen Consumption (mL/kg/min) | Percent Predicted (%) |
|---|---|---|---|
| Test 1 | 1127 | 14.8 | 71 |
| Test 2 | 1223 | 16.1 | 77 |

| V/AT Values | Oxygen Consumption (mL/min) | Oxygen Consumption (mL/kg/min) | Percent Predicted (%) |
|---|---|---|---|
| Test 1 | 786 | 10.4 | 49 |
| Test 2 | 822 | 10.8 | 52 |

mL/min – milliliters per minute
mL/kg/min – milliliters per kilogram per minute
V/AT – ventilatory/anaerobic threshold
*(determined using V-slope, ventilatory equivalents, and end-tidal pressure methods)*

3. <u>Work in Watts</u>

| Workload | V/AT (W) | Peak (W) | Percent Predicted (%) |
|---|---|---|---|
| Test 1 | 34 | 84 | 85 |
| Test 2 | 35 | 84 | 85 |

W – Watts
V/AT – ventilatory/anaerobic threshold

La Chanda Webb

### 4. Cardiovascular Responses

| **Heart Rate** | Resting Seated (bpm) | V/AT (bpm) | Peak (bpm) | Percent Predicted (%) |
|---|---|---|---|---|
| Test 1 | 69 | 110 | 153 | 89 |
| Test 2 | 74 | 114 | 154 | 90 |

| **Blood Pressure** | Resting Supine (mmHg) | Peak (mmHg) |
|---|---|---|
| Test 1 | 122/84 | 164/90 |
| Test 2 | 128/76 | 168/84 |

bpm – beats per minute
mmHg – millimeters of mercury
V/AT – ventilatory/anaerobic threshold

### 5. Respiratory Responses

| | VE/VCO2 | PETCO2 (mmHg) | VE (L/min) |
|---|---|---|---|
| Test 1 | 29 | 43 | 44.7 |
| Test 2 | 30 | 37 | 44.1 |

VE/VCO2 – minute ventilation/carbon dioxide output; (20-30 normal range)
PETCO2 – partial pressure of end tidal carbon dioxide (<40mmHg, low; <30mmHg, very low)
VE - ventilation

### 6. Recovery Response

A post exercise test log was maintained by the patient. Following testing the patient experienced profound fatigue despite significant rest, dizziness/lightheadedness, nausea, migraine headache, widespread pain, flu-like symptoms, gastric problems, insomnia, sensitivity to smells and light, stiffness, paralysis, and cognitive difficulties. Patient was not recovered 7 days post-testing.

La Chanda Webb

**Summary:**

The patient's low peak oxygen consumption, early onset of oxygen consumption at the ventilatory/anaerobic threshold (V/AT)[*] and symptom exacerbation post activity indicates significant impairment. Energy expenditures at or close to the V/AT represent vigorous activity and can be sustained for only short periods of time. The International Labor Organization regard 30% or less of maximal oxygen consumption ($VO_{2max}$) as the threshold for acceptable physiological demands over an 8-hour workday. Estimated energy expenditures for most occupations and life activities can be found in the Compendium of Physical Activities.

Based upon a test 2 measured peak exercise capacity of 16.1 ml·kg$^{-1}$·min$^{-1}$, the safe limit for sustained activity is an oxygen consumption of around 4.8 ml·kg$^{-1}$·min$^{-1}$. This is below the estimated oxygen requirement for seated office or computer work of 5.25 ml·kg$^{-1}$·min$^{-1}$. And even sedentary work involves more than just sitting at a desk. For normal office tasks, the energy cost rises to 10.5 ml·kg$^{-1}$·min$^{-1}$ which is at the V/AT. Energy expenditures at or close to this level will likely result in symptom exacerbation and delayed recovery. Driving to and from work would require 8.75 ml·kg$^{-1}$·min$^{-1}$ of oxygen. In addition, everyday activities such as showering (7.0 ml·kg$^{-1}$·min$^{-1}$) or making the bed (11.6 ml·kg$^{-1}$·min$^{-1}$) represent significant energy demands. The patient should limit activities requiring oxygen consumption above 4.8 ml·kg$^{-1}$·min$^{-1}$ and avoid, if possible, activities requiring oxygen consumption beyond the test 2 V/AT of 10.8 ml·kg$^{-1}$·min$^{-1}$. Maximal heart rate should not exceed 114 beats per minute. Even a sedentary job would require more energy than can be safely sustained.

---

[*] The ventilatory/anaerobic threshold is an important index of the amount of work that can be sustained. Work intensities above the ventilatory/anaerobic threshold require energy production derived from anaerobic sources limiting the duration at which such intensities of effort can be maintained, causing cumulative fatigue and extending recovery time. Most activities of daily living (reading, walking at a normal pace, computer use, office-type work, etc.) are aerobic in nature and healthy individuals are able to perform such activities for prolonged periods of time with no meaningful physical fatigue. If the ventilatory/anaerobic threshold occurs at low oxygen consumption, normal daily activities may exceed the energy demands that can be met through oxidative metabolism, thus requiring anaerobic metabolism to provide energy. This results in early onset fatigue and prolonged recovery.

7

La Chanda Webb


Signature Page


Christopher R. Snell, Ph. D

La Chanda Webb

## Bibliography

Ainsworth B. E., Haskell W. L., Herrmann S. D., Meckes N., Bassett Jr D. R., Tudor-Locke C., Greer J.L., Vezina J., Whitt-Glover M. C., Leon A.S. The Compendium of Physical Activities Tracking Guide. Healthy Lifestyles Research Center, College of Nursing & Health Innovation, Arizona State University. Retrieved from https://sites.google.com/site/compendiumofphysicalactivities/.

Balady, G. J., Arena, R., Sietsema, K., Myers, J., Coke, L., Fletcher, G. F., ... & Milani, R. V. (2010). Clinician's Guide to Cardiopulmonary Exercise Testing in Adults A Scientific Statement From the American Heart Association. *Circulation*, *122*(2), 191-225.

Forman, D. E., Myers, J., Lavie, C. J , Guazzi, M., Celli, B., & Arena, R. (2010). Cardiopulmonary Exercise Testing. *Postgraduate medicine*, *122*(6).

Guazzi, M., Adams, V., Conraads, V., Halle, M., Mezzani, A., Vanhees, L , ... & Myers, J. (2012). Clinical Recommendations for Cardiopulmonary Exercise Testing Data Assessment in Specific Patient Populations. *Circulation*, *126*(18), 2261-2274.

Institute of Medicine (U.S.). Committee on the Diagnostic Criteria for Myalgic Encephalomyelitis/Chronic Fatigue Syndrome. *Beyond myalgic encephalomyelitis/chronic fatigue syndrome  redefining an illness.* Washington, D.C.: The National Academies Press; 2015.

Karwowski, W., editor. International encyclopedia of ergonomics and human factors. Crc Press; 2001.

Levin, R., Dolgin, M., Fox, C., & Gorlin, R. (1994). The Criteria Committee of the New York Heart Association: Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels. *LWW Handbooks*, *9*, 344.

Natelson, B. H., Intriligator R, Cherniack NS, Chandler HK, Stewart JM. Hypocapnia is a biological marker for orthostatic intolerance in some patients with chronic fatigue syndrome. Dynamic Medicine. 2007 Dec;6(1):2.

Pescatello, L. S., Arena, R., Riebe, D., Thompson, P. D. (2013). *ACSM's guidelines for exercise testing and prescription*. Lippincott Williams & Wilkins, Philadelphia.

Rondinelli, R. D , Genovese, E., & Brigham, C. R. (Eds.). (2008). *Guides to the evaluation of permanent impairment*. American Medical Association.

Ross, R. M., Beck, K. C., Casaburi, R., Johnson, B. D., Marciniuk, D. D., Wagner, P. D , & Weisman, I. M. (2003). ATS/ACCP statement on cardiopulmonary exercise testing. *American journal of respiratory and critical care medicine*, *167*(10), 1451-1451.

Social Security Administration. (2014). 4.00 Cardiovascular System - Adult In *Disability Evaluation Under Social Security*. Retrieved from http://www.ssa.gov/disability/professionals/bluebook/4.00-Cardiovascular-Adult.htm.

Stellman, J. M. (Ed.). (1998). *Encyclopaedia of occupational health and safety* (Vol. 1). International Labour Organization. Retrieved from http://www.iloencyclopaedia.org/.

Weber, K. T , & Janicki, J. S. (1985). Cardiopulmonary exercise testing for evaluation of chronic cardiac failure. *The American journal of cardiology*, *55*(2), A22-A31.

## Publications

Snell, C. R., Stevens, S. R., Davenport, T. E., & Van Ness, J. M. (2013). Discriminative Validity of Metabolic and Workload Measurements for Identifying People With Chronic Fatigue Syndrome. *Physical therapy*, *93*(11), 1484-1492.

Van Den Eede, F., Moorkens, G., Hulstijn, W , Maas, Y., Schrijvers, D., ... & Sabbe, B. G. (2011). Psychomotor function and response inhibition in chronic fatigue syndrome. *Psychiatry research*, *186*(2), 367-372.

Davenport, T. E., Stevens, S. R., Baroni, K., Van Ness, M., & Snell, C. R. (2011). Diagnostic accuracy of symptoms characterising chronic fatigue syndrome. *Disability and Rehabilitation*, *33*(19-20), 1768-1775.

VanNess, J. M., Stevens, S. R., Bateman, L., Stiles, T. L., & Snell, C. R. (2010). Postexertional malaise in women with chronic fatigue syndrome. *Journal of Women's Health*, *19*(2), 239-244.

Ciccolella, M. E., Snell, C. R., Stevens, S. R., & VanNess, J. M. (2007). Legal and Scientific Considerations of the Exercise Stress Test in Chronic Fatigue Syndrome. *Journal of Chronic Fatigue Syndrome*, 14(2):61-76.

VanNess, J. M., Snell, C. R., & Stevens, S. R. (2007). Diminished cardiopulmonary capacity during post-exertional malaise. *Journal of Chronic Fatigue Syndrome*, *14*(2), 77-85.

Snell, C. R., Vanness, J. M., Strayer, D. R., & Stevens, S. R. (2005). Exercise capacity and immune function in male and female patients with chronic fatigue syndrome (CFS). *in vivo*, *19*(2), 387-390.

VanNess, J. M., Snell, C. R., Strayer, D. R., Dempsey, L., & Stevens, S. R. (2003). Subclassifying chronic fatigue syndrome through exercise testing. *Medicine and science in sports and exercise*, *35*(6), 908-913.

Snell, C. R., Vanness, J. M., Strayer, D. R., & Stevens, S. R. (2002). Physical performance and prediction of 2-5A synthetase/RNase L antiviral pathway activity in patients with chronic fatigue syndrome. *In vivo (Athens, Greece)*, *16*(2), 107.

VanNess, J. M., Snell, C. R., Fredrickson, D. M., Strayer, D. R., & Stevens, S. R. (2001). Assessment of functional impairment by cardiopulmonary exercise testing in patients with chronic fatigue syndrome. *Journal of Chronic Fatigue Syndrome*, *8*(3-4), 103-109.

Stevens, S. R. (1995). Using exercise testing to document functional disability in CFS. *Journal of Chronic Fatigue Syndrome*, *1*(3-4), 127-129.

WEBB APL - 008

## Workwell  Foundation

Ripon, CA 95366

| | | | | | |
|---|---|---|---|---|---|
| Name:  Webb, La Chanda | ID:  CR#108 | BSA:  1.79 | Date:  10/26/2020 |
| Tech: | Height:  63.0 | Age:  49 | Room: |
| Doctor: | Weight:  167.4 | Sex:  Female | Race:  Black |

Pre Test Comments:

Post Test Comments:

Last Calibration: 10/26/2020  08:14:26  Start Exercise:  181   Seconds       Start Recovery:  532   Seconds

| | Rest | AT | VO2 Max | Pred | AT /  VO2 Max  (%) | VO2 Max/Pred (%) |
|---|---|---|---|---|---|---|
| **Time (min)** | 3:00 | 5:20 | 9:00 | | | |
| **Ex Time (min)** | | 2:19 | 5:51 | | | |
| **---- WORK ----** | | | | | | |
| **Work (Watts)** | 0 | 34 | 25 | 99 | 136 | 25 |
| **Speed (RPM)** | | 69 | 52 | | 133 | |
| **---- VENTILATION ----** | | | | | | |
| **Vt BTPS (L)** | 0.40 | 0.55 | 1.12 | | 49 | |
| **RR (br/min)** | 22 | 34 | 41 | | 82 | |
| **VE BTPS (L/min)** | 8.6 | 18.4 | 46.1 | 90.0 | 40 | 51 |
| **---- O2 CONSUMPTION** | | | | | | |
| **VO2 (mL/kg/min)** | 2.8 | 9.0 | 14.9 | 21.0 | 60 | 71 |
| **VO2 (mL/min)** | 210 | 683 | 1133 | 1594 | 60 | 71 |
| **VCO2 (mL/min)** | 175 | 548 | 1554 | 1929 | 35 | 81 |
| **RER** | 0.83 | 0.80 | 1.37 | | 58 | |
| **---- CARDIAC ----** | | | | | | |
| **HR (BPM)** | 86 | 112 | 148 | 171 | 76 | 86 |
| **VO2/HR (mL/beat)** | 3 | 6 | 7 | 9 | 88 | 76 |
| **---- V/Q ----** | | | | | | |
| **VE/VCO2** | 49 | 34 | 30 | 33 | 114 | 91 |
| **VE/VO2** | 41 | 27 | 41 | 40 | 66 | 103 |
| **PETCO2 (mmHg)** | 41 | 43 | 39 | | 109 | |
| **PETO2 (mmHg)** | 109 | 107 | 127 | | 84 | |
| **-------------------** | | | | | | |
| **sysBP (mmHg)** | 118 | 118 | 152 | | 78 | |
| **diaBP (mmHg)** | 78 | 78 | 88 | | 89 | |
| **RatePrsPd SBP*HR/100** | 94 | 130 | 244 | 325 | 53 | 75 |
| **Borg PE** | 11 | 15 | 19 | | 79 | |

Bike Summary  (Last 20 of 20 Averaging)

WEBB APL - 009

Workwell  Foundation

Ripon, CA 95366

| Name: | Webb, La Chanda | ID: | CR#108 | BSA: | 1.79 | Date: | 10/26/2020 |
|-------|------------------|-----|--------|------|------|-------|------------|
| Tech: | | Height: | 63.0 | Age: | 49 | Room: | |
| Doctor: | | Weight: | 167.4 | Sex: | Female | Race: | Black |

|  | -- | **Min Value** | - |
|--|----|---------------|---|
| **---- V/Q ----** | | | |
| **VE/VCO2** | | 29 | |
| **VE/VO2** | | 32 | |
| **PETCO2 (mmHg)** | | 40 | |
| **PETO2 (mmHg)** | | | |

**Normals**

| | Normal | Patient |
|--|--------|---------|
| Functional Capacity (VO2Max/Pred VO2Max) | >85% | 71% |
| Anaerobic Threshold (VO2AT/Pred VO2Max) | >40% | 43% |

**Respiratory**

| | | |
|--|--|--|
| Breathing Reserve (1-(VEMax/Pred VEMax)) | >30% | 49.0; -44L |
| Respiratory Rate (Rest to VO2Max) | 8 - 50 | 22 - 41 |
| VT/FVC (Rest to VO2Max) | .15 - .60 | 0 - 0 |

**Ventilation/Perfusion**

| | | |
|--|--|--|
| VD/VT (Rest to VO2Max) | .35 - <.25 | 0.48 - 0.20 |
| P(a-ET)CO2 (Rest to VO2Max) | +3.0 - <0 | 0 - 0 |
| P(A-a)O2 (Rest to VO2Max) | <21.0 | 0 - 0 |

**Cardiac**

| | | |
|--|--|--|
| Heart Rate Reserve(1-(HRMax/Pred HRMax)) | <15% | 6.0 |
| O2 Pulse (Rest to VO2Max) | 15 | 3 - 7 |
| Blood Pressure (Rest to VO2Max) | <230/90 | 118/78 - 152/88 |
| Exercise Oscillatory Ventilation (EOV) | Undefined | Undefined |

WEBB APL - 010



Workwell Foundation

Ripon, CA 95366

| Name: | Webb, La Chanda | ID: | CR#108 | BSA: | 1.79 | Date: | 10/26/2020 |
|---|---|---|---|---|---|---|---|
| Tech: | | Height: | 63.0 | Age: | 49 | Room: | |
| Doctor: | | Weight: | 167.4 | Sex: | Female | Race: | Black |



WEBB APL - 011

Workwell Foundation

Ripon, CA 95366

| Name: | Webb, La Chanda | ID: | CR#108 | BSA: | 1.79 | Date: | 10/26/2020 |
|---|---|---|---|---|---|---|---|
| Tech: | | Height: | 63.0 | Age: | 49 | Room: | |
| Doctor: | | Weight: | 167.4 | Sex: | Female | Race: | Black |



| ABC | AT | V02 Max | ABC | AT | V02 Max |
|---|---|---|---|---|---|
| Time (min) | 5:18 | 8:50 | VE BTPS (L/min) | 19.4 | 47.9 |
| Work (Watts) | 34 | 87 | Vt BTPS (L) | 0.61 | 1.14 |
| | | | Vt/IC (%) | | |
| VO2 (mL/kg/min) | 10.4 | 15.5 | Vd/Vt - est | 0.30 | 0.19 |
| VO2 (mL/min) | 786 | 1178 | | | |
| VCO2 (mL/min) | 622 | 1611 | VE/VCO2 | 31 | 30 |
| RER | 0.79 | 1.37 | VE/VO2 | 25 | 41 |
| HR(non filtered) (BPM) | 110 | 160 | | | |
| VO2/HR (mL/beat) | 7 | 7 | sysBP (mmHg) | 118 | 152 |
| | | | diaBP (mmHg) | 78 | 88 |
| | | | RatePrsPd SBP*HR/100 | 130 | 244 |
| | | | Borg PE | 15 | 19 |

V-Slope Graph  (Mid 5 of 7 Averaging)

Workwell Foundation

Ripon, CA 95366

| Name: | Webb, La Chanda | | ID: | CR#108 | | BSA: | 1.79 | | Date: | 10/26/2020 |
| Tech: | | | Height: | 63.0 | | Age: | 49 | | Room: | |
| Doctor: | | | Weight: | 167.4 | | Sex: | Female | | Race: | Black |

| Time (min) | Work (Watts) | VO2 (mL/min) | VO2 (mL/kg/min) | VCO2 (mL/min) | RER | HR (BPM) | VE BTPS (L/min) | RR (br/min) | SpO2 (%) | sysBP (mmHg) | diaBP (mmHg) | Borg PE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0:20 | 0 | 231 | 3.0 | 189 | 0.82 | 69 | 7.6 | 16 | 100 | | | 11 |
| 0:40 | 0 | 224 | 3.0 | 184 | 0.82 | 77 | 8.7 | 21 | 100 | | | 11 |
| 1:00 | 0 | 413 | 5.4 | 351 | 0.85 | 76 | 11.7 | 20 | 100 | | | 11 |
| 1:20 | 0 | 266 | 3.5 | 245 | 0.92 | 78 | 9.8 | 20 | 100 | | | 11 |
| 1:40 | 0 | 241 | 3.2 | 220 | 0.91 | 79 | 9.9 | 24 | 100 | 118 | 78 | 11 |
| 2:00 | 0 | 206 | 2.7 | 188 | 0.92 | 80 | 9.2 | 23 | 100 | 118 | 78 | 11 |
| 2:20 | 0 | 158 | 2.1 | 141 | 0.89 | 80 | 7.6 | 20 | 100 | 118 | 78 | 11 |
| 2:40 | 0 | 236 | 3.1 | 195 | 0.83 | 83 | 9.2 | 23 | 100 | 118 | 78 | 11 |
| 3:00 | 0 | 210 | 2.8 | 175 | 0.83 | 86 | 8.6 | 22 | 100 | 118 | 78 | 11 |
| **Start E** | | | | | | | | | | | | |
| 3:20 | 4 | 487 | 6.4 | 454 | 0.93 | 89 | 16.7 | 29 | 100 | 118 | 78 | 11 |
| 3:40 | 9 | 490 | 6.5 | 489 | 1.00 | 93 | 18.7 | 36 | 100 | 118 | 78 | 15 |
| 4:00 | 14 | 373 | 4.9 | 365 | 0.98 | 97 | 15.3 | 34 | 100 | 118 | 78 | 15 |
| 4:20 | 19 | 501 | 6.6 | 446 | 0.89 | 100 | 16.9 | 35 | 100 | 118 | 78 | 15 |
| 4:40 | 24 | 568 | 7.5 | 492 | 0.87 | 103 | 18.4 | 36 | 100 | 118 | 78 | 15 |
| 5:00 | 29 | 653 | 8.6 | 597 | 0.91 | 107 | 21.0 | 36 | 100 | 118 | 78 | 15 |
| **AT** | | | | | | | | | | | | |
| 5:20 | 34 | 683 | 9.0 | 548 | 0.80 | 112 | 18.4 | 34 | 100 | 118 | 78 | 15 |
| 5:40 | 39 | 819 | 10.8 | 719 | 0.88 | 117 | 23.2 | 37 | 100 | 118 | 78 | 15 |
| 6:00 | 44 | 802 | 10.6 | 773 | 0.96 | 121 | 24.7 | 38 | 100 | 144 | 86 | 15 |
| 6:20 | 49 | 893 | 11.8 | 880 | 0.99 | 125 | 26.6 | 39 | 100 | 144 | 86 | 15 |
| 6:40 | 54 | 894 | 11.8 | 926 | 1.04 | 130 | 28.1 | 39 | 100 | 144 | 86 | 17 |
| 7:00 | 59 | 993 | 13.1 | 1072 | 1.08 | 133 | 31.0 | 38 | 100 | 144 | 86 | 17 |
| 7:20 | 64 | 1018 | 13.4 | 1164 | 1.14 | 138 | 33.7 | 41 | 100 | 144 | 86 | 17 |
| 7:40 | 69 | 1037 | 13.7 | 1240 | 1.20 | 143 | 34.8 | 38 | 100 | 144 | 86 | 17 |
| 8:00 | 74 | 1099 | 14.5 | 1424 | 1.30 | 147 | 41.0 | 41 | 100 | 152 | 88 | 17 |
| 8:20 | 79 | 1098 | 14.5 | 1437 | 1.31 | 149 | 41.0 | 40 | 100 | 152 | 88 | 17 |
| 8:40 | 84 | 1127 | 14.8 | 1523 | 1.35 | 149 | 44.7 | 42 | 100 | 152 | 88 | 19 |
| **Start R** | | | | | | | | | | | | |
| 9:00 | 25 | 1133 | 14.9 | 1554 | 1.37 | 148 | 46.1 | 41 | 100 | 152 | 88 | 19 |
| 9:20 | 25 | 1153 | 15.2 | 1413 | 1.23 | 144 | 40.2 | 38 | 100 | 152 | 88 | 19 |
| 9:40 | 25 | 974 | 12.8 | 1178 | 1.21 | 137 | 33.9 | 34 | 100 | 152 | 88 | 19 |
| 10:00 | 25 | 911 | 12.0 | 1044 | 1.15 | 127 | 30.3 | 33 | 100 | 164 | 90 | 19 |
| 10:20 | 25 | 776 | 10.2 | 861 | 1.11 | 120 | 25.7 | 32 | 100 | 164 | 90 | 19 |
| 10:40 | 25 | 832 | 11.0 | 911 | 1.09 | 118 | 27.7 | 34 | 100 | 164 | 90 | 19 |
| 10:51 | 25 | 754 | 9.9 | 817 | 1.08 | 117 | 24.6 | 31 | 100 | 164 | 90 | 19 |

Bike Time Down  (Last 20 of 20 Averaging)

Workwell Foundation

Ripon, CA 95366

| Name: | Webb, La Chanda | ID: | CR#108 | BSA: | 1.79 | Date: | 10/26/2020 |
|---|---|---|---|---|---|---|---|
| Tech: | | Height: | 63.0 | Age: | 49 | Room: | |
| Doctor: | | Weight: | 167.4 | Sex: | Female | Race: | Black |



VE/VCO2 slope output  (Last 20 of 20 Averaging)

WEBB APL - 014

Workwell  Foundation

Ripon, CA 95366

| Name: | Webb, La Chanda | ID: | CR#108 | BSA: | 1.79 | Date: | 10/27/2020 |
|---|---|---|---|---|---|---|---|
| Tech: | | Height: | 63.0 | Age: | 49 | Room: | |
| Doctor: | | Weight: | 167.4 | Sex: | Female | Race: | Black |

Pre Test Comments:

Post Test Comments:

Last Calibration:10/27/2020  08:46:49  Start Exercise:  183  Seconds      Start Recovery:  524  Seconds

| | Rest | AT | V02 Max | Pred | AT /  VO2 Max  (%) | VO2 Max/Pred (%) |
|---|---|---|---|---|---|---|
| Time (min) | 3:00 | 5:40 | 8:40 | | | |
| Ex Time (min) | | 2:37 | 5:37 | | | |
| ---- WORK ---- | | | | | | |
| Work (Watts) | 0 | 39 | 84 | 99 | 46 | 85 |
| Speed (RPM) | 3 | 72 | 47 | | 153 | |
| ---- VENTILATION ---- | | | | | | |
| Vt BTPS (L) | 0.47 | 0.59 | 0.98 | | 61 | |
| RR (br/min) | 32 | 43 | 45 | | 96 | |
| VE BTPS (L/min) | 15.0 | 25.6 | 44.1 | 90.0 | 58 | 49 |
| ---- O2 CONSUMPTION | | | | | | |
| VO2 (mL/kg/min) | 5.4 | 11.3 | 16.1 | 21.0 | 70 | 77 |
| VO2 (mL/min) | 410 | 861 | 1223 | 1594 | 70 | 77 |
| VCO2 (mL/min) | 372 | 762 | 1489 | 1929 | 51 | 77 |
| RER | 0.91 | 0.88 | 1.22 | | 73 | |
| ---- CARDIAC ---- | | | | | | |
| HR (BPM) | 91 | 120 | 147 | 171 | 81 | 86 |
| VO2/HR (mL/beat) | 5 | 7 | 8 | 9 | 93 | 84 |
| ---- V/Q ---- | | | | | | |
| VE/VCO2 | 40 | 34 | 30 | 33 | 113 | 91 |
| VE/VO2 | 37 | 30 | 36 | 40 | 82 | 91 |
| PETCO2 (mmHg) | 35 | 37 | 36 | | 102 | |
| PETO2 (mmHg) | 115 | 113 | 125 | | 90 | |
| ------------------- | | | | | | |
| sysBP (mmHg) | 130 | 130 | 168 | | 77 | |
| diaBP (mmHg) | 82 | 82 | 84 | | 98 | |
| RatePrsPd SBP*HR/100 | 115 | 155 | 263 | 325 | 59 | 81 |
| Borg PE | 11 | 15 | 20 | | 75 | |

Bike Summary  (Last 20 of 20 Averaging)

WEBB APL - 015

Workwell  Foundation

Ripon, CA 95366

| Name: | Webb, La Chanda | ID: | CR#108 | BSA: | 1.79 | Date: | 10/27/2020 |
|---|---|---|---|---|---|---|---|
| Tech: | | Height: | 63.0 | Age: | 49 | Room: | |
| Doctor: | | Weight: | 167.4 | Sex: | Female | Race: | Black |

|  | -- | **Min Value** | - |
|---|---|---|---|
| **---- V/Q ----** | | | |
| **VE/VCO2** | | 30 | |
| **VE/VO2** | | 29 | |
| **PETCO2 (mmHg)** | | 34 | |
| **PETO2 (mmHg)** | | | |

### Normals

| | Normal | Patient |
|---|---|---|
| Functional Capacity (VO2Max/Pred VO2Max) | >85% | 77% |
| Anaerobic Threshold (VO2AT/Pred VO2Max) | >40% | 54% |

### Respiratory

| | | |
|---|---|---|
| Breathing Reserve (1-(VEMax/Pred VEMax)) | >30% | 51.1; -46L |
| Respiratory Rate (Rest to VO2Max) | 8 - 50 | 32 - 45 |
| VT/FVC (Rest to VO2Max) | .15 - .60 | 0 - 0 |

### Ventilation/Perfusion

| | | |
|---|---|---|
| VD/VT (Rest to VO2Max) | .35 - <.25 | 0.34 - 0.14 |
| P(a-ET)CO2 (Rest to VO2Max) | +3.0 - <0 | 0 - 0 |
| P(A-a)O2 (Rest to VO2Max) | <21.0 | 0 - 0 |

### Cardiac

| | | |
|---|---|---|
| Heart Rate Reserve(1-(HRMax/Pred HRMax)) | <15% | 8.3 |
| O2 Pulse (Rest to VO2Max) | 15 | 5 - 8 |
| Blood Pressure (Rest to VO2Max) | <230/90 | 130/82 - 168/84 |
| Exercise Oscillatory Ventilation (EOV) | Undefined | Undefined |

Bike Summary 2  (Last 20 of 20 Averaging)

WEBB APL - 016

Workwell Foundation

Ripon, CA 95366

| Name: | Webb, La Chanda | ID: | CR#108 | BSA: | 1.79 | Date: | 10/27/2020 |
|---|---|---|---|---|---|---|---|
| Tech: | | Height: | 63.0 | Age: | 49 | Room: | |
| Doctor: | | Weight: | 167.4 | Sex: | Female | Race: | Black |



9 Panel Print  (Mid 5 of 7 Averaging)

Workwell Foundation

Ripon, CA 95366

| Name: | Webb, La Chanda | ID: | CR#108 | BSA: | 1.79 | Date: | 10/27/2020 |
|---|---|---|---|---|---|---|---|
| Tech: | | Height: | 63.0 | Age: | 49 | Room: | |
| Doctor: | | Weight: | 167.4 | Sex: | Female | Race: | Black |



| ABC | AT | VO2 Max |
|---|---|---|
| Time (min) | 5:25 | 8:38 |
| Work (Watts) | 35 | 83 |
| VO2 (mL/kg/min) | 10.8 | 16.9 |
| VO2 (mL/min) | 822 | 1283 |
| VCO2 (mL/min) | 686 | 1560 |
| RER | 0.83 | 1.22 |
| HR(non filtered) (BPM) | 114 | 157 |
| VO2/HR (mL/beat) | 7 | 8 |

| ABC | AT | VO2 Max |
|---|---|---|
| VE BTPS (L/min) | 23.3 | 46.4 |
| Vt BTPS (L) | 0.55 | 1.03 |
| Vt/IC (%) | | |
| Vd/Vt - est | 0.24 | 0.13 |
| VE/VCO2 | 34 | 30 |
| VE/VO2 | 28 | 36 |
| sysBP (mmHg) | 130 | 168 |
| diaBP (mmHg) | 82 | 84 |
| RatePrsPd SBP*HR/100 | 149 | 265 |
| Borg PE | 15 | 20 |

V-Slope Graph  (Mid 5 of 7 Averaging)

Workwell Foundation

Ripon, CA 95366

| Name: | Webb, La Chanda | | ID: | CR#108 | | BSA: | 1.79 | | Date: | 10/27/2020 |
| Tech: | | | Height: | 63.0 | | Age: | 49 | | Room: | |
| Doctor: | | | Weight: | 167.4 | | Sex: | Female | | Race: | Black |

| Time (min) | Work (Watts) | VO2 (mL/min) | VO2 (mL/kg/min) | VCO2 (mL/min) | RER | HR (BPM) | VE BTPS (L/min) | RR (br/min) | SpO2 (%) | sysBP (mmHg) | diaBP (mmHg) | Borg PE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0:20 | 0 | 294 | 3.9 | 226 | 0.77 | 74 | 9.4 | 24 | 81 | | | |
| 0:40 | 0 | 251 | 3.3 | 196 | 0.78 | 78 | 8.6 | 21 | 81 | | | |
| 1:00 | 0 | 242 | 3.2 | 196 | 0.81 | 76 | 8.9 | 22 | 82 | | | |
| 1:20 | 0 | 251 | 3.3 | 193 | 0.77 | 76 | 8.5 | 21 | 48 | | | |
| 1:40 | 0 | 220 | 2.9 | 172 | 0.78 | 77 | 8.4 | 23 | | | | |
| 2:00 | 0 | 230 | 3.0 | 186 | 0.81 | 79 | 8.3 | 21 | 100 | | | |
| 2:20 | 0 | 244 | 3.2 | 199 | 0.81 | 81 | 7.9 | 18 | 100 | | | |
| 2:40 | 0 | 303 | 4.0 | 265 | 0.87 | 86 | 10.5 | 22 | 100 | 130 | 82 | |
| 3:00 | 0 | 410 | 5.4 | 372 | 0.91 | 91 | 15.0 | 32 | 99 | 130 | 82 | 11 |
| **Start E** | | | | | | | | | | | | |
| 3:20 | 4 | 577 | 7.6 | 582 | 1.01 | 96 | 21.3 | 40 | 100 | 130 | 82 | 11 |
| 3:40 | 9 | 501 | 6.6 | 521 | 1.04 | 100 | 20.1 | 41 | 100 | 130 | 82 | 11 |
| 4:00 | 14 | 562 | 7.4 | 511 | 0.91 | 104 | 19.7 | 40 | 100 | 130 | 82 | 11 |
| 4:20 | 19 | 711 | 9.4 | 650 | 0.91 | 105 | 22.6 | 37 | 100 | 130 | 82 | 15 |
| 4:40 | 24 | 658 | 8.7 | 601 | 0.91 | 107 | 21.9 | 41 | 100 | 130 | 82 | 15 |
| 5:00 | 28 | 658 | 8.7 | 525 | 0.80 | 110 | 19.2 | 41 | 100 | 130 | 82 | 15 |
| 5:20 | 34 | 809 | 10.7 | 617 | 0.76 | 115 | 19.1 | 33 | 100 | 130 | 82 | 15 |
| **AT** | | | | | | | | | | | | |
| 5:40 | 39 | 861 | 11.3 | 762 | 0.88 | 120 | 25.6 | 43 | 100 | 130 | 82 | 15 |
| 6:00 | 44 | 987 | 13.0 | 908 | 0.92 | 125 | 29.4 | 45 | 100 | 140 | 82 | 17 |
| 6:20 | 49 | 985 | 13.0 | 884 | 0.90 | 131 | 28.0 | 43 | 100 | 140 | 82 | 17 |
| 6:40 | 54 | 1073 | 14.1 | 1015 | 0.95 | 136 | 31.5 | 45 | 100 | 140 | 82 | 17 |
| 7:00 | 59 | 1081 | 14.2 | 1077 | 1.00 | 140 | 32.9 | 46 | 100 | 140 | 82 | 17 |
| 7:20 | 64 | 1164 | 15.3 | 1230 | 1.06 | 143 | 36.1 | 43 | 100 | 140 | 82 | 17 |
| 7:40 | 69 | 1140 | 15.0 | 1287 | 1.13 | 147 | 37.8 | 43 | 100 | 140 | 82 | 19 |
| 8:00 | 74 | 1159 | 15.3 | 1355 | 1.17 | 149 | 39.4 | 42 | 100 | 140 | 82 | 19 |
| 8:20 | 79 | 1213 | 16.0 | 1462 | 1.20 | 149 | 42.5 | 45 | 100 | 168 | 84 | 19 |
| 8:40 | 84 | 1223 | 16.1 | 1489 | 1.22 | 147 | 44.1 | 45 | 100 | 168 | 84 | 20 |
| **Start R** | | | | | | | | | | | | |
| 9:00 | 25 | 1182 | 15.6 | 1388 | 1.17 | 144 | 38.7 | 39 | 100 | 168 | 84 | 20 |
| 9:20 | 25 | 1132 | 14.9 | 1279 | 1.13 | 140 | 36.3 | 40 | 100 | 168 | 84 | 20 |
| 9:40 | 25 | 1072 | 14.1 | 1183 | 1.10 | 131 | 35.0 | 42 | 100 | 168 | 84 | 20 |
| 10:00 | 25 | 915 | 12.1 | 1025 | 1.12 | 127 | 32.3 | 48 | 100 | 142 | 80 | 20 |
| 10:20 | 25 | 930 | 12.3 | 960 | 1.03 | 123 | 28.4 | 39 | 100 | 142 | 80 | 20 |
| 10:40 | 25 | 854 | 11.3 | 885 | 1.04 | 120 | 28.8 | 47 | | 142 | 80 | 20 |
| 10:43 | 25 | 817 | 10.8 | 804 | 0.99 | 118 | 25.3 | 42 | | 142 | 80 | 20 |

Bike Time Down  (Last 20 of 20 Averaging)

WEBB APL - 019

Workwell  Foundation

Ripon, CA 95366

| Name: | Webb, La Chanda | ID: | CR#108 | BSA: | 1.79 | Date: | 10/27/2020 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Tech: | | Height: | 63.0 | Age: | 49 | Room: | |
| Doctor: | | Weight: | 167.4 | Sex: | Female | Race: | Black |





**Golden State**
**NEUROPSYCHOLOGY**

Pediatric • Adult • Clinical • Forensic

4766 Park Granada, Suite 202
Calabasas, CA 91302
**P** 805.379.4939 or 818.518.1057
**F** 818.222.2365
admin@goldenstateneuro.com
goldenstateneuropsychology.com

**Karen L. Schiltz, PhD,** CA PSY9508
PEDIATRIC & YOUNG ADULT NEUROPSYCHOLOGIST
**Associates:**
Steven A. Castellon, PhD, CA PSY16775
Amy M. Schonfeld, PhD, CA PSY20434
Asal Nejad, PsyD, CA PSY28994
Cara J. Kiff, PhD, CA PSY27786

## CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION

| | |
|---|---|
| Patient's Name: | La Chanda Webb |
| Date of Birth: | January 3, 1971 |
| Age at Testing: | 49 years |
| Date of Interview: | November 22, 2020 |
| Date of Evaluation: | November 24, 2020 |
| Date of Report: | January 7, 2021 |
| Educational Level: | 13 years |
| Handedness: | Right |

### REASON FOR REFERRAL

Ms. La Chanda Webb is a 49-year-old, right-handed, African-American female with 13 years of formal education. She is being referred for testing by her attorney, Andrew Kantor, who is helping with her appeal of denial of long-term disability benefits by Unum.  Ms. Webb has been diagnosed with several medical conditions including fibromyalgia (FM) and chronic fatigue syndrome (CFS) and has reported enduring pain, fatigue, and cognitive inefficiency that have been present for at least the last couple of years.  She has been unable to work as a (high-level) paralegal with the law firm Ziffren & Brittenham, LLP, since March of 2019. The current assessment sought to quantify current cognitive performance and opine as to how this might impact employability.

### MEDICAL-LEGAL CONTEXT OF EVALUATION

Ms. Webb was informed that the medical-legal context of the current evaluation leads to some very important differences from a typical clinical evaluation. She was notified that in this context no doctor-patient relationship exists and that no feedback or recommendations would be provided after testing, as might often be the case in a clinical evaluation.  She was reminded that feedback and/or a written report would be provided to her attorney, Andrew Kantor, who had referred her for this evaluation. Ms. Webb indicated understanding these issues and expressed consent to proceed with the evaluation.

### IMPACT OF COVID-19 ON EVALUATION PROCESS

The following precautions were implemented to address and minimize the risks of face-to-face testing during a pandemic.
1. Discussion of risks associated with face-to-face exposure and full informed consent on what the process would involve on the day of testing.  Verbal and written consent obtained.
2. Social distancing and sanitizing protocols in place, including use of plexiglass barriers, masks and face shields, and frequent wiping down of surfaces touched by either examiner or patient.
3. Conducting of the clinical interview via video teleconferencing to reduce the amount of face-to-face time spent on day of testing and obviate the need to speak extensively wearing masks.

<div style="border:1px solid black">

**HISTORY OF ILLNESS and CURRENT CONCERNS**

</div>

[*Information presented below was gathered from clinical interview with Ms. Webb that was conducted by video teleconferencing on 11/22/20, responses to symptom rating scales completed during a testing session 11/24/20, as well as medical records provided for review by Andrew Kantor, the attorney representing Ms. Webb in her appeal of denial of LTD benefits.*]

Ms. Webb reported that her struggles started in early 2018 while she was working as a paralegal for Ziffren & Brittenham, LLP a firm specializing in entertainment law.  She stated that this job was "my dream job, literally, ... I loved it".  She noted that sometime "around January of 2018, I started getting sick and having all these problems ... I had no idea what was going on". She reported she would have "extreme exhaustion" and fatigue, pain, spasms, and also be in what she termed a "cognitive fog". She noted examples such as having to re-read documents ("like legal contracts") multiple times and that she would often lose track of where she was in the process. She stated that there were times where "I feel like my brain just shut down ... like I couldn't read at all – it just freaked me out – I wondered if I was dying". She had a host of physical and somatic symptoms at this time: headaches (including migraines), tingling and numbness in her hands and feet, and enduring and often extreme fatigue.  She stated that some days "I would wake up and I felt almost like I couldn't move at all, like a paralysis".

She noted that she started seeing a lot of different doctors trying to find out what was going on and get treatment for her problems. She went out on short-term disability in 2018 for several months and then tried to return.  However, she noted that "when I went back, I found I just couldn't do it". Her pain and fatigue symptoms got bad, including the cognitive fog. By March of 2019, she had to leave her job on disability and she has not worked since that time.

Ms. Webb reported that she took great pride in her professional identity as a paralegal who played a respected and crucial role in a high-powered law firm. She stated "I've always been a hard worker and have had a strong work ethic – that's always been who I am".  Ms. Webb reported feeling depressed and extremely worried about the impact that her medical conditions (and associated symptoms) have had on her identity and feelings about herself, not to mention her ability to earn an income.  She said "I felt like I wasn't able to do 10 or 12-hour days ... I just couldn't keep up ...  Everything took me longer to do the same amount of work." She noted that while her efficiency went way down that "no one said anything to me but I think they noticed" and by the time she left she felt like "I didn't want to cheat the firm and at this rate I was going to get fired".

Ms. Webb has a valid California driver's license and is able to drive without restriction. She denied any moving violations, car accidents or near misses, but noted that she has greatly reduced the amount she drives (especially if outside her immediate area) – note partly in response to covid-19 her driving needs have reduced considerably. She noted that when she is feeling particularly fatigued, she will not drive. She still manages her own finances and takes her own medications.  She is independent in activities of daily living but, during a period of extreme fatigue she will find it hard to "even get out of bed" or take care of basic ADLs like taking as shower and getting dressed.  These activities take more out of her than they ever used to and can leave her feeling "completely exhausted".

Ms. Webb noted that she has frequently struggled with fatigue over the last two-plus years, even prior to her diagnosis of CFS.  She indicated that there are rarely any days when she doesn't feel a degree of fatigue when getting out of bed.  On a self-report fatigue questionnaire (*Fatigue Symptom Inventory; FSI*) she reported that her *worst fatigue* in the week preceding testing was an 10 (of 10), that her *least*

*fatigued* in the prior week was a 7 (of 10), and that her fatigue level on the day of testing was a 7 (of 10). She endorsed that in the past week, fatigue *interfered with her general level of activity* at a 10 (of 10). Fatigue was endorsed to impact her concentration (i.e., harder to concentrate when fatigued) at a 10 (of 10). Ms. Webb reported that fatigue was present in 7 out of 7 days in the week preceding the evaluation and that there is no predictable daily pattern to the fatigue (e.g., worse in morning or evening).

On a cognitive functioning questionnaire (*Patient's Assessment of Own Functioning Inventory*; PAOFI), Ms. Webb noted significant problems in the following areas as indicated by a frequency of these events as "fairly often" or greater: ***Memory***: "forgetting things that have been told to you within the last day or two", "forgetting events which have occurred in the last day or two", "failing to finish something you started because you forgot you were doing it", "forgetting things that you knew a year or more ago", "forgetting things that you knew or met a year or more ago" "failing to finish things because you forgot you were doing it"; "losing or misplacing items"; "forgetting things you were supposed to do (like pay bills, put gas in car) ***Language and Communication***: "having difficulty understanding the things being said to you", "it is easier to have people show you what to do, rather than tell you what to do", "having difficulty thinking of the names of things". ***Higher Level Cognitive Functions***: "becoming more distracted from what you are doing or saying by insignificant things that you once would've been able to ignore", "having more difficulty solving problems that come up around the house or at your job", "having more difficulty now you used to following directions on how to get somewhere".

## RELEVANT BACKGROUND INFORMATION

Ms. La Chanda Webb is a right-handed, divorced African-American woman with 13 years of education. She was born in San Francisco and raised in the Silicon Valley. She was married and divorced twice, the first union very brief and the second time, lasting about 4 years at age 36. Ms. Webb has no biological children but is the legal guardian of her niece, who is 17 years old, and lives with her. English is her primary language. She has one older half-brother and one younger sister and both parents are still living. Her mother finished high school and her father finished college.

***Developmental history.*** Ms. Webb reported being born on time, of normal birth weight, and denied complications with her mother's pregnancy or with her birth. She reported meeting all developmental milestones early or within expected range (e.g. talking, walking, toilet training). She denied any head injuries or major medical problems as a child or adolescent.

***Educational history***. Ms. Webb reported being a strong student ("I was in gifted classes") and received mostly As and Bs through primary and secondary schooling. She was never held back and denied ever needing special classes or tutors. She stated that she was in a long-term relationship right out of high school and because of that connection got in to "managing groups and musicians … kind of as a talent manager". She reported doing well in that occupation for "about 5 or 6 years" and then realized as she was seeing all these contracts coming through that "I could do this stuff and I just kind of taught myself all about contracts ... I wanted to learn more about it so I decided to go in to a paralegal training program". In terms of the program that she went to, she stated "it no longer exists" but it was full time for about 12 months  [*For purposes of normative data, she is credited with 13 years of education (High School Diploma + 1 year of post-secondary study)*].

***Occupational history***. After completing her paralegal training, Ms. Webb reported working for about 11 years in this field with Ziffren & Brittenham until she left on disability in early 2019. She reported

that prior to her illnesses/symptoms she was a highly valued and respected member of the firm and did very well in all aspects of her job. She stated "I was one of the top producers, I was highly effective, I was taking care of other people". She indicated that she would routinely be required to work 10-hour (or longer) days and sometimes 6-7 days a week. In 2018 and 2019 she was unable to do that and "I just couldn't keep up physically or mentally". She stated that "my efficiency went way down" and in spite of nobody saying anything to her she stated "I'm pretty sure they noticed me struggling". Her job involved lots of work with reviewing, interpreting, drafting, analyzing, and writing contracts in the entertainment business. It also involved considerable interaction with employees of the firm and clients alike.

*Medical history*.  She noted that she was diagnosed with CFS and Fibromyalgia "around the end of 2018 or early 2019".  She has consistently seen rheumatology, neurology, primary care, and mental health since that time to manage her symptoms. She stated she completed a home sleep study about 18 months ago and they found "mild sleep apnea … about 8.1 events per hour".  She reported that she has a CPAP machine but only uses it intermittently – "it causes me claustrophobia and anxiety". She had "gastric sleeve" surgery at UCLA in mid-2018.

*Mental health treatment history*.  Ms. Webb denied any history of psychiatric hospitalization. She reported that she has seen a psychiatrist and psychologist/therapist since her medical struggles. She has never attempted suicide but has reported passive suicidal ideation on occasion, which she has generally attributed to the losses associated with her medical conditions.

*Substance use history.* Ms. Webb denied history of substance use disorder. She stated that she drinks alcohol "rarely" over the last few months and when she does it is typically "one or two small glasses of wine".  She noted that there have been periods where she drank alcohol more frequently but that it was always "social drinking" and never associated with problems or impairment.  She endorsed the occasional use of "cannabis gummies" for sleep and pain control, although she stated "these made me feel foggy or loopy, so I stopped taking them".  There is no history of illicit drug use or abuse of prescription medications.

*Family history*.  Family history is significant for depression (sister) and alcohol and anxiety problems (brother). There is no history of neurological conditions or neurodegenerative disorders (Alzheimer's) but there is a history of learning disability/mental retardation in an uncle.

## RECORDS REVIEWED

[NOTE: More than 2,000 pages of medical and medical/legal records were provided for review by attorney representing Ms. Webb with her LTD denial appeal. These included progress notes, reports, laboratory values, imaging studies, insurance and legal correspondence, medication records from several physicians and/or providers who have been involved in the patient's care over the last few years.  As many of the medical records are somewhat redundant, only a few relevant excerpts from these records are noted below.]

**Cardiopulmonary Exercise Test (CPET) Report, dated 11/13/2020, Christopher Snell, Ph.D.**

Testing took place October 26 and 27 in the author's laboratory. Indication for testing is listed as follows: "… patient was referred to our lab for global functional evaluation examining metabolic, cardiovascular and pulmonary function after experiencing physical stress."

Noted that patient "underwent a cardiopulmonary exercise test-retest over a two-day period. She is 49 years-old, 63 inches tall and weighs 167.4 pounds."  Dr. Snell described the CPET evaluation procedure protocol (page 2 of report): "The patient performed symptom limited 20 W/min ramping protocols on a bicycle ergometer while expired gases were collected for determination of oxygen consumption, carbon dioxide production and pulmonary ventilation. Two exercise tests were performed on consecutive days. The heart rate, blood pressure and arterial oxygen saturation were assessed throughout the tests. Appropriate measures were taken to calibrate and test the accuracy and reliability of the testing equipment on both days. These tests were performed to determine functional capacity and assess recovery response to a standardized physical stressor."

Assessment of Ms. Webb's effort (page 3) is listed as "normal" – listed "patient was cooperative and there is no evidence of malingering". Several tables are included in the report (see pages 3-5) that would seem to show "abnormal" performance on several aspects of the CPET, to include metabolic responses, workload, cardiovascular response, respiratory response, and recovery response.

Dr. Snell concludes in the report's Summary section (page 6), the following: "The patient's low peak oxygen consumption, early onset of oxygen consumption at ventilatory/anaerobic threshold (V/AT)* and symptom exacerbation post activity indicates significant impairment. Energy expenditures at or close to the V/AT represent vigorous activity and can be sustained for only short periods of time. The International Labor Organization regard 30% or less of maximal oxygen consumption (VO2max) as the threshold for acceptable physiological demands over an 8-hour workday. Estimated energy expenditures for most occupations and life activities can be found in the Compendium of Physical Activities. Based upon a test 2 measured peak exercise capacity of 16.1 ml. kg-1.min-1 , the safe limit for sustained activity is an oxygen consumption of around 4.8 ml. kg-1.min-1 . This is below the estimated oxygen requirement for seated office or computer work of 5.25 ml. kg-1 min-1 . And even sedentary work involves more than just sitting at a desk. For normal office tasks, the energy cost rises to 10.5 ml. kg-1.min-1 which is at the V/AT. Energy expenditures at or close to this level will likely result in symptom exacerbation and delayed recovery. Driving to and from work would require 8.75 ml. kg-1.min-1 of oxygen. In addition, everyday activities such as showering (7.0 ml. kg-1.min-1 ) or making the bed (11.6 ml. kg-1.min-1 ) represent significant energy demands. The patient should limit activities requiring oxygen consumption above 4.8 ml. kg-1.min-1 and avoid, if possible, activities requiring oxygen consumption beyond the test 2 V/AT of 10.8 ml. kg-1.min-1 . Maximal heart rate should not exceed 114 beats per minute. Even a sedentary job would require more energy than can be safely sustained."

The main findings from the CPET evaluation (placed on page 1) are listed as follows: "Ms. Webb demonstrates cardiopulmonary anomalies*, low function and delayed recovery with severe symptom exacerbation post-exertion. This will severely limit her ability to engage in normal activities of daily living and precludes employment of even a sedentary/stationary nature."

### Selected Medical Records from UCLA (various dates, various providers, excerpts only):

4/01/2020 Progress Note:  Brendan Riley, DPM. noted the following on her problem list:  Fatigue PCOS (polycystic ovarian syndrome) Diabetes mellitus OSA (obstructive sleep apnea) Morbid obesity Diabetes mellitus without complication Gastroesophageal reflux disease Polycystic ovarian disease Moderate recurrent major depression (HCC) Chronic fatigue syndrome Visual disturbance Myalgia

Intractable migraine without status migrainosus Cognitive decline Myofascial pain dysfunction syndrome Arthralgia Fibromyalgia Thiamine deficiency Depression

10/31/2019 Progress note: Note from LCSW Katherine Sarkarati.  "Depression in response to Health Issues".  Notes from therapy session that discuss reactions to job loss and its impact on her self-worth and identity.  Mindfulness based therapy.  Notes of low energy and being overwhelmed by complex tasks. Cognitive complaints noted.  Psychiatric history including "depression due to fibromyalgia". No history of psychiatric hospitalization. Note of some passive SI.  Notes prior medication trials and prior psychotherapy.

7/5/2019 Progress note: Note from Dr. David Yu, MD. Notes the impact of pain and fatigue on relationships and work. "She has a foggy brain".  Pain and fatigue for years.  Described the nature of the work at the law firm.  Hard and demanding, "constantly on call". Diagnostic impressions "Fibromyalgia with widespread pain".

8/7/2019 Progress note: Geraldine Navarro, MD. Long commutes increase pain. She is a paralegal in a high-profile law firm. Told by Dr. Yu that Cymbalta "most likely isn't going to help".  Light really triggers HA.  Noted that "patient has been more forgetful".  Noted that "muscle pain is diffuse, all day long". Feels like "she got hit by a truck".  Surgeries listed breast reduction, laparoscopic sleeve (7/2018). Dx impression include fibromyalgia. Myofascial pain dysfunction syndrome.

8/29/2019 Progress note: Annie Zhang, MD.  Acupuncture at East-West Medicine. Patient presents with Chronic Fatigue.  "Has had severe fatigue for last couple of years". Can't do many of the things she used to do. Work issues. Relationship issues. Depression. Workload is extremely high and stressful

8/29/2019 Progress note: Carolyn Go, MD.  Acupuncture at East-West Medicine. Patient presents with Chronic Fatigue.

8/29/2019 Progress note: Anita Tipirnini MD.  Neurology. Patient presents for follow up with neuropathy, headaches, memory decline.  Pain and tingling in bilateral hands and feet.  "Headaches related to neck and shoulder pain". Describes migraines components of headache. When seen in 4/18 concern for chronic migraines and compression neuropathy.  Note of normal brain MRI in January of 2018.  Note of "cognitive decline with evidence of deficits on testing today". Noted that referral for neuropsychological testing recommended.

1/17/2019 Progress note: Andrew Shubov, MD.  Acupuncture at East-West Medicine. Notes that she has been sleeping better since laparoscopic surgery. Chronic neck muscle tightness. Noted that the treatments (acupuncture) do help her improve energy but are short lasting.  Assessment and impression includes Chronic Fatigue, Work Related Stress, Cervical Myofascial Pain Syndrome, Neck Tightness.

---

**BEHAVIORAL OBSERVATIONS**

---

Ms. Webb completed a 70-minute clinical interview on 11/22/2020 via encrypted video teleconference service and came in to the office for 5 hours of testing on 11/24/2020. She arrived approximately 10 minutes late for the scheduled examination, having driven from the Los Angeles area.  She was casually dressed, adequately groomed and there were no deficits in hygiene or self-care evident. She appeared

her stated age of 49 and was in no apparent distress.  She ambulated with a normal gait, normal arm swing, and walked unassisted during the day and had no difficulty transferring in and out of a seated position.  There was no tremor noted. Rapport was easily established and maintained throughout the evaluation. She was cooperative with the evaluation and was a good historian and seemed well aware of the chronology and details of personal history, including her medical conditions and their treatment. Her mood was somewhat subdued and with mildly flattened affect but she seemed to become more animated and engaged within 30-minutes or so of the evaluation starting. In general, affect was judged to be of normal range and consistent with mood.  She became tearful when discussing her perceived changes related to the fibromyalgia and chronic fatigue.  Her work identity was clearly an extreme source of pride and accomplishment and, without it, she admits that she struggles with sadness and finding meaning. She endorsed some passive suicidal ideation that, upon further questioning, she convincingly stated is not something she would ever act upon. She denied either active plan or intent or past history of attempt.  She stated that she sometimes feels hopeless and is extremely frustrated with the medical-legal evaluation process.  Anxiety about the testing was apparent initially but seemed to subside as rapport was established (and we had spoken for over an hour two days earlier, via Zoom). She denied psychotic-spectrum symptoms and nothing contradicting this was observed. Ms. Webb's speech was of normal rate, volume, prosody and content without evidence of obvious word-finding difficulty. She was able to work steadily throughout the day with a few brief (e.g. 3-5 minute) breaks during the day and an hour-long break around lunch time.  She was able to complete approximately 5 hours of testing. It was clear that she was tiring towards the end of testing but she wanted to push through and did so. Although neither were formally tested, her hearing and vision appeared adequate for testing and there was no suggestion of perceptual deficit that might compromise testing validity. She seemed fully engaged in the testing process and showed solid task persistence across and within tests.  She put forth excellent effort on testing and performed within normal range on tests of performance validity.  Similarly, there was no behavioral suggestion of suboptimal or inconsistent effort and results of the current evaluation are considered an accurate reflection of her current cognitive functioning.

## MEDICATIONS AT TIME OF TESTING

MAGNESIUM-OXIDE 400 mg tablet: fluocinolone 0.01 % scalp oil; ibuprofen 200 mg tablet; rosuvastatin 5 mg tablet; thiamine 100 mg tablet; triamcinolone 0.1% ointment; VICTOZA 18 mg/3 mL injection; Vitamin D3 25 mcg (1000 units) Caps

## TESTS ADMINISTERED

Animal Fluency
Beck Anxiety Inventory (BAI)
Beck Depression Inventory, 2nd Edition (BDI-II)
Behavioral Rating Inventory of Executive Function, Adult Version (BRIEF-A)
Boston Naming Test (BNT)
Brief Test of Attention (BTA)
Brief Visuospatial Memory Test, Revised (BVMT-R)
California Verbal Learning Test, 2nd Edition (CVLT-2)
Controlled Oral Word Association Task (F-A-S)
Connor's Continuous Performance Test, 2nd Edition (CPT-2)
Fatigue Symptom Inventory (FSI)
Grooved Pegboard

Patient Assessment of Own Functioning Inventory (PAOFI)
Rey Fifteen Item Test (with recognition)
Rey Osterreith Complex Figure Test (ROCF)
Test of Premorbid Function (TOPF)
Trailmaking Test
Victoria Symptom Validity Test
Wechsler Adult Intelligence Scale, 4th Edition
Wechsler Memory Scale, 4th Edition (WMS-IV)
    Logical Memory

---

**TEST RESULTS**

[Please see attached Appendix A: Summary Sheet of Scores – for raw data and normative sources utilized].

***As a general aid in interpreting results mentioned below, a guideline for use of performance terms as they relate to percentile scores***:

Impaired Range = $\leq$1st percentile
Borderline Range = 2nd – 9th percentiles
Low Average Range = 10th – 25th percentiles
Average Range = 26th – 74th percentile
High Average Range = 75th – 90th percentiles
Superior Range = 91st – 97th percentiles
Very Superior Range = 98th – 99th percentiles

**Performance Validity/Effort/Motivation**

Ms. Webb completed multiple tests designed to measure performance validity and test-taking effort. These tests are sensitive to sub-optimal effort, non-credible performance, and/or malingering.  On each measure she scored within normal limits (see Summary Sheet), suggesting she exerted adequate effort and was not attempting to feign or exaggerate deficits.  Her performance on measures of test taking effort/performance validity converges with behavioral observations made by the examiner, that Ms. Webb exerted full effort during the evaluation.

**Intellectual Functioning**

Estimated Premorbid IQ:  Estimates of premorbid intellectual functioning were made using the Test of Premorbid Functioning (TOPF), a word-reading task requiring the individual to read aloud/pronounce phonetically irregular words. This task is highly correlated with overall IQ.  Ms. Webb's score on the TOPF estimated her premorbid Full-Scale IQ in the High Average range (FSIQ = 112, 79th percentile).

Observed Intellectual Functioning: Ms. Webb was administered the 4th edition of the Wechsler Adult Intelligence Scale (WAIS-IV) as a measure of her current intellectual ability. Comparing her scores with those of similar age, her Full-scale IQ was Average range (FSIQ = 95; 37th percentile) as was her score on the General Ability Index (GAI = 105; ;63rd percentile). When these scores are compared to women of similar age, ethnicity and *educational attainment*, the scores are as follows: FSIQ = 73rd percentile, GAI = 95th percentile. There is a statistically significant discrepancy between these two scores (GAI > FSIQ).

Examining the composite scores that comprise the WAIS-IV, her Verbal Comprehension (VC) composite was in the High Average range compared to those of similar age (VC = 112, 79th percentile) and in the Superior when compared to those of similar, age, ethnicity, gender, and education (96th percentile). Her Perceptual Reasoning composite was in the Average range compared to persons of similar age (PR = 98, 45th percentile) and in the High Average range compared to other women of same age, race, and education (82nd percentile). Ms. Webb's performance on the Working Memory composite (WM) was in the Average range compared to age based normative data (WM = 92, 30th percentile) and also when it is compared to women of similar age, race, and educational level (54th percentile). Her performance on the WAIS-IV Processing Speed (PS) composite was in the Borderline range when compared to those of similar age (PS = 74, 4th percentile) and also compared to women of similar age, race and education (6th percentile). It is highly likely that based upon estimates of Ms. Webb's overall premorbid IQ (using the TOPF) and her performance on the WAIS-IV GAI, that her WAIS-IV Processing Speed index scores is a weakness and represents a drop in function.

**Attention**

Ms. Webb showed solid simple attention but variable divided attention and deficits in her ability to sustain attention.  Simple attention was within the Average range compared to others of similar age, race, gender, and educational background (WAIS-IV Digit Span = 38th percentile).  While she scored within the Average range on a test of mental arithmetic that requires her to employ working memory (WAIS-IV Arithmetic = 69th percentile) and showed an Average range Working Memory index score (54th percentile), on an auditory divided attention task she scored in the Low Average range (BTA = 13th percentile). She performed very poorly on a computerized test of her ability to focus and sustain attention over time, with her performance severely impaired [CPT-2: seven of the eight measures abnormal/impaired range].

**Verbal Learning and Memory**

Ms. Webb's performance on measures of verbal learning and memory was less efficient than expected. On the CVLT-2, a list-learning task on which she had to listen to and learn a 16-item list of words being read aloud over five trials, her score on the first learning trial was considerably below expected, in the Borderline range (CVLT-2 Trial 1 = 7th percentile). Her scores improved over subsequent learning trials and by the fifth and final trial her score was only in the Average range (CVLT-2 Trial 5 = 31st percentile). Taken together, her performance across the five learning trials was in the Average range (CVLT-2 List A Total Score = 27th percentile). When she was presented a second list of words to learn after hearing the first list several times, she again performed lower than expected, scoring in the Low Average range (List B = 16th percentile).  Her free recall of previously learned material, both immediate and after a longer delay, was again lower than expected (Short Delay Free Recall = 7th percentile; Long Delay Free Recall = 16th percentile), although she improved a bit with cueing at each time point (Short Delay Cued Recall = 16th percentile; Long Delay Cued Recall = 31st percentile). Scores on the recognition paradigm of the CVLT-2 were normal range (Recognition Hits = 31st percentile; CVLT-2 Recognition Discriminability = 69th percentile).  She performed better on a verbal memory test where she was required to memorize and then recall details from short stories that she had been read.  This test provides more context and structure than does the list-learning task referenced above and her score was within the Average range both immediately after hearing the stories (WMS-IV Logical Memory I = 37th percentile) and after a 30-minute delay (WMS-IV Logical Memory II = 37th percentile).

**Non-verbal Learning and Memory**

Ms. Webb's performance on tasks within this domain was even less efficient than it was for verbal learning and memory.  On all three learning trials on a task where she was briefly shown designs and asked to then draw those designs from memory, she scored lower than expected and, occasionally, markedly so (BVMT-R Trial 1 = 16th percentile; Trial 2 = 10th percentile; Trial 3 = 5th percentile). Taken together, this performance placed her within the Borderline range compared to those of similar age (BVMT-R Total Recall = 7th percentile).  She showed an Average range learning slope (34th percentile) and the information she learned she was mostly able to retain (percent retained = 100%) over a delay period, although this score was still in the Low Average range (BVMT-R Delay Recall = 12th percentile). She was able to correctly recognize all 6 designs following the extended delay period and did not make any false positive identifications on the recognition portion of the test.   She scored in the Borderline range on a test requiring the recall of the visual details of a complex design that she had copied a few minutes earlier (ROCF, Immediate Recall = 5th percentile) and again following a more extended delay (ROCF, Delayed Recall = 5th percentile).

**Language**

Performance was solid in this domain and Ms. Webb showed no evidence of difficulty.  Conversational speech was normal for rate, prosody, tone, and volume and there was no evidence of difficulty with her word-finding during spontaneous conversation. Her performance on the Boston Naming Test was in the Average range compared to women of similar age, race, and educational level (BNT: 53/60 = 50th percentile).  Her score on the WAIS-IV Vocabulary subtest placed her in the Superior range compared to women of similar age, education, and ethnicity (WAIS-IV Vocabulary = 90th percentile); her WAIS-IV Verbal Comprehension composite fell within the Superior range, as well (96th percentile).  Verbal fluency when given a semantic exemplar was in the Average range (Animal fluency = 46th percentile) and again in the Average when given phonemic exemplar (COWAT FAS = 42nd percentile).  Ms. Webb showed no deficits with praxis and had no difficulty reading test instructions or visually presented materials.

**Visuoperception and Visuoconstruction Skills**

Ms. Webb's performance in this domain seemed generally intact. Compared to women of similar age, education and race, she scored in the High Average range on a test requiring determination of spatial relationships between multiple parts of a design (WAIS-IV Visual Puzzles = 76th percentile) and also on a non-verbal, abstract reasoning tasks (WAIS-IV Matrix Reasoning = 89th percentile). She scored in the Average range on a measure requiring her to construct designs from blocks (WAIS-IV Block Design, 62nd percentile). Her performance on the WAIS-IV Perceptual Reasoning composite placed her within the High Average range compared to women of similar age, education level, and race (PRI = 98, 82nd percentile). The one poor performance in this area was likely due to poor planning and strategy (versus visuospatial problem, *per se*) as she scored in the Impaired range on her copy of a complex figure was (ROCF: 27.5 = 1st percentile).  Although her vision was not formally tested, she showed no sign of visual field cut and didn't express difficulty seeing the testing stimuli or reading test forms.

**Psychomotor Speed, Information-Processing Speed**

Most scores in this domain were suggestive of slowing of information processing speed.  Her scores on a timed test of visual scanning and sequencing were in the Low Average range compared to women of

similar age, education, and race (Trails A = 19th percentile).  She showed pronounced slowing on the processing speed tests from the WAIS-IV. She scored in the Borderline range on a test where she was required to scan a visual array for target symbols and to distinguish them from foils (WAIS-IV Symbol Search = 8th percentile) and she performed equally poorly on a digit symbol substitution task under time pressure (WAIS-IV Coding = 6th percentile).  As above, compared to other women of similar age, race, and educational level, her score on the WAIS-IV Processing Speed composite placed her within Borderline range (6th percentile). On the Stroop Color-Naming and Word-Reading cards, her times were in the Low Average range (Stroop Color = 13th percentile, Stroop Word = 15th percentile), although she scored in the Average range on phonemic verbal fluency task, relative to other women of similar age, race, and educational level (F-A-S = 42nd percentile).

**Motor Speed/Dexterity**

Ms. Webb is right-handed.  On a task of speeded fine motor coordination, her completion time placed her in the Low Average range with her dominant hand (Grooved Pegboard Dominant = 16th percentile) and also with her non-dominant left hand (Grooved Pegboard Non-Dominant = 21st percentile).

**Executive Functioning**

Executive functions are higher-order cognitive processes that allow one to plan, initiate, sequence, and monitor purposeful, goal-directed behavior. Ms. Webb's performance on those measures of executive functioning was variable, with some scores within expectations but others much lower-than-expected for a bright and previously high-functioning individual. For example, she did extremely well on a task that required her to determine the similarities between items, concepts, and/or situations (WAIS-IV Similarities = 99th percentile) and in the Average range on a phonemic verbal fluency task (F-A-S = 42nd percentile) and, as noted above, her scores on WAIS-IV Working Memory index were Average range (54th percentile).  On a task that required visual scanning and sequencing of a page of numbers and letters that measures rapid conceptual set shifting, she scored in the Average range relative to women of similar age, race, and education (Trails B = 63rd percentile).  However, she struggled on an auditory divided attention test (BTA = 13th percentile) and also on a task that requiring response inhibition of an overlearned response in favor of a less habitual one (Stroop Interference = 4th percentile).  Finally, her scores were suggestive of deficit on a test measuring non-verbal problem solving, cognitive flexibility, and concept formation, the Wisconsin Card Sorting Test (WCST) (WCST Conceptual Level Responses = 1st percentile, Total Errors = 2nd percentile, Perseverative Errors = 4th percentile).

**Emotional and Behavioral Functioning: Symptom Rating Scales**

Depression and Anxiety Symptoms: Ms. Webb's score on a depression rating scale was in the severe range (BDI-II = 36), over the two weeks preceding and including the day of testing.  Although she did deny suicidal ideation, she endorsed considerable feelings of self-reproach and also feeling helpless or hopeless. Some of the items that she endorsed on the BDI are diagnostically ambiguous and are not necessarily indicative of depression (e.g. fatigue, concentration problems, insomnia) but, in the context of sadness and anhedonia must be considered as potentially mood disorder-related.  Also, in a similar fashion, her score on a self-report rating scale including several anxiety symptoms at time of testing (and within the preceding week) was also in the severe range (BAI = 47) and suggestive of prominent anxiety symptoms/signs.

Frontal/Executive Functioning: Ms. Webb completed the Behavioral Rating Inventory of Executive Functioning, Adult version (BRIEF-A – self-report version). The BRIEF-A asks about presence of some of the behavioral, emotional, and cognitive symptoms sometimes associated with executive dysfunction over the preceding month. On the BRIEF there was no suggestion of exaggeration or inconsistency and her answers suggest that she struggles with her ability to initiate tasks and activities, has difficulty with planning and organizing tasks and activities, difficulty monitoring tasks and some aspects of emotional dysregulation.

## CLINICAL IMPRESSIONS and DIAGNOSTIC CONSIDERATIONS

Ms. La Chanda Webb is a 49-year-old, right-handed, Black female with 13 years of education referred for neurocognitive testing by her attorney Andrew Kantor, who is assisting with her appeal of long-term disability denial.  Ms. Webb has been unable to successfully work as a paralegal at a high-end law firm, due to CFS/ME, which has included ongoing reports of cognitive dysfunction. This evaluation sought to document her current level of cognitive functioning and opine as to whether any cognitive dysfunction, if present, might impact employability.

Test-taking Effort, Performance Validity – Current Evaluation:

Given the medical-legal context of the evaluation, where secondary gain issues must be considered, it should be noted that **Ms. Webb showed solid test-taking effort** during this evaluation.  Her scores on all performance validity tests (PVTs) did not suggest symptom exaggeration, dissimulation, or frank malingering.  PVT scores are consistent with the observations made during the evaluation – that she was exerting full, consistent effort.

Summary of Key Results from Current Evaluation:

Estimates of Ms. Webb's premorbid IQ place her in the High Average range (TOPF-estimated IQ = 112, 79th percentile), suggesting that she is a bright individual.

Given solid test-taking effort and assumed higher-than-average premorbid cognitive functioning, **there is evidence of cognitive compromise seen on the current evaluation.**  Areas of decline in her cognitive efficiency were seen in these domains:

- Psychomotor/information-processing speed
- Sustained attention
- Non-verbal learning and memory
- Verbal-learning and memory (variable)

The most consistent deficit seen across the evaluation was slowing of information processing speed. This was reflected in tasks with a motor component (e.g., Trails A, WAIS-IV Coding, no time bonus on WAIS-IV Block Design) but also on tasks without significant motor demands (e.g., Stroop Color and Word cards, WAIS-IV Symbol Search).  Her WAIS-IV Processing Speed composite score (6th percentile for age, race, education, and gender), was dramatically lower than her GAI as well as her estimated premorbid IQ and is highly likely to represent a decline in function from previous levels.

Effortful attention, especially her sustained attention, was also less efficient than expected. On the CPT-2 her ability to sustain and focus her attention was impaired on seven of eight outcomes (CPT-2

omission errors, commission errors, variability, detectability etc.).  She also scored in the Low Average range on a test of auditory divided attention (BTA =13th percentile).

Her scores on measures of learning and memory are likely reflective of decline in that area as well. On a verbal learning test (CVLT-2), her first trial learning was at the 7th percentile and while she showed an adequate learning slope her recall and rate of overall learning were still lower than expected given her age and estimated premorbid IQ.  Her immediate recall of information she had previously learned was well below expected (7th percentile) as was her long-delay free recall (16th percentile).  Of note, she did show the ability to benefit from cueing (category cues or use of a recognition paradigm on the CVLT-2) and actually showed decent learning of details when she was provided with inherent structure seen in short stories (WMS-IV Logical Memory stories).   Learning and memory problems were also seen with non-verbal/visual learning and memory tests (BVMT-R and ROCF).  It is important to point out that there was no suggestion of encoding deficits – such as one might see in a neurodegenerative condition like Alzheimer's disease – but rather difficulty with active retrieval.

Both Fibromyalgia and Chronic Fatigue Syndrome (CFS) has been shown in studies to impact cognitive functioning among a subset of sufferers. The types of deficits seen on Ms. Webb's current evaluation have been seen in the literature on Fibromyalgia and Chronic Fatigue (e.g., Bell et al., 2018; Cockshell & Mathias, 2014; Rasouli et al., 2019; Togo et al., 2015).  The cognitive domains most typically impacted include information processing speed, effortful and divided attention, and learning and memory.

Medical records and the clinical interview both suggest Ms. Webb has struggled with depression and anxiety since her diagnosis. She has consistently reported that her losses in functional capacity and in her occupational functioning and professional identity have left her both anxious and depressed. In my professional opinion, any depression and anxiety present should be considered, in terms of diagnostic conceptualization, as "due to her medical conditions". It is known that mood disturbance can impact cognitive functioning and is often present in both fibro and chronic fatigue (e.g. Christley et al., 2013). I agree with UCLA mental health providers (Therapist: Katherine Sarkarati, LCSW; Psychiatrist: Dustin DeYoung, MD), that her struggles with mood is in fact *due* to her medical issues and the associated losses.

Regarding her prognosis, I would ultimately defer to the medical professionals involved in Ms. Webb's ongoing treatment. For example, rheumatologists Drs. Navarro and Yu would better be able to discuss how likely various disease management techniques will be going forward.  From what I can tell, she has consistently sought out and actively participated in multi-modal attempts to treat her conditions such as FM and CFS.  She has tried various medications, and behavioral modifications and treatments but still remains highly symptomatic in terms of fatigue, pain, and cognitive issues.  Mood disturbance is being treated as well but is, at best, only partially controlled. Given that pain and fatigue are conditions that make one less cognitively efficient and that cognition, pain, and fatigue interact synergistically, I would opine that without a fairly dramatic improvement in fatigue and pain, a full cognitive return to baseline is unlikely.

Diagnostic Impressions (based upon DSM-5):

Based upon this evaluation, Ms. Webb meets DSM-5 criteria for **331.83 Mild Neurocognitive Disorder, due to a medical condition (Fibromyalgia; Chronic Fatigue Syndrome)**.  Neuropsychological testing showed multiple areas of relative cognitive compromise and based upon objective evidence as well as consistent report from Ms. Webb, her cognitive limitations have caused impairment in occupational

and social functioning.  Although Ms. Webb can do most activities of daily living (e.g., dressing, bathing, self-care), there have been times when even these tasks were overwhelming for the patient. She noted that these can take a considerable toll on her and may require her to rest and recuperate more than most people.  Also, with more complex tasks that have more of a cognitive component, such as driving long distances, cooking, managing financial records and doing taxes, she has shown impairment over the last couple of years.  To be clear, the term "Mild" is used in diagnostic nosology of neurocognitive disorders (distinguished from "Major"), the impact upon her life has been anything but mild.

**CONCLUSIONS REGARDING DISABILITY**

Scores on the current neuropsychological evaluation show deficits in areas of information processing speed, effortful attention (especially sustained attention), and learning and memory.  Scores in these areas stand in stark contrast to her above average overall intellectual function and high premorbid IQ (estimates in the High Average range). In my professional opinion, these cognitive issues ***make it highly unlikely*** that she could successfully return to the work she was doing as a lead paralegal in a top end law firm. In addition to the marked slowing of information-processing speed and deficits in both her sustained and divided attention, her lack of efficiency learning new information when it is initially presented (i.e. first-trial learning) makes it hard to imagine what higher-level cognitive activities she could successfully execute during a typical work day (and she noted that 10-hour days were routine). From review of her medical records, it is clear that *pain, migraines, fatigue, and malaise have all been present for several years now.*  Given the neurocognitive findings on testing, as well as Dr. Snell's CPET findings (abnormal metabolic, recovery, pulmonary findings), I believe that she is totally disabled.

Thank you for the opportunity to participate in this case. If you have questions or concerns regarding this evaluation, please do not hesitate to contact Dr. Castellon at (310) 916-9275.

_____

Steven A. Castellon, Ph.D.
Golden State Neuropsychology &
David Geffen School of Medicine at UCLA
California License: PSY 16775

WEBB APL - 034

**Literature Cited**:

1.  Bell, T., Trost, z., Buelow, M.T. et al. (2018). Meta-analysis of cognitive performance in fibromyalgia. Journal of Clinical and Experimental Neuropsychology, 40, 698-714.

2.  Christley, Y., Duffey, T., Everall, I.P., & Martin, C.R. (2013).  The neuropsychiatric and neuropsychological features of chronic fatigue syndrome: revisiting the enigma. *Current Psychiatry Reports, 15*, 353-362.

3.  Cockshell, S., & Mathias, J.L. (2014). Cognitive functioning in people with chronic fatigue syndrome: a comparison between subjective and objective measures.  *Neuropsychology, 28*, 394-405.

4.  Rasouli, O., Gotaas, M.E., Stensdotter, A., et al. (2019). Neuropsychological dysfunction in chronic fatigue syndrome and the relation between objective and subjective findings. *Neuropsychology, 33, 658-669.*

5.  Togo, F., Lange, G., Natelson, B.H., & Quigley, K.S. (2015). Attention network test: Assessment of cognitive function in chronic fatigue syndrome. *Journal of Neuropsychology, 9*, 1-9.

6.  Teodoro, T., Edwards, M.J., & Isaacs, J.D. (2019) A unifying theory for cognitive abnormalities in functional neurological disorders, fibromyalgia and chronic fatigue syndrome: systematic review

### *APPENDIX: Neuropsychological Assessment Summary Sheet*

| Name: | La Chanda Webb | Education: | 13 years |
|---|---|---|---|
| Date of Birth: | January 3, 1971 | Date of Evaluation: | November 24, 2020 |
| Age: | 49 | Handedness: | Right |

**a** = age-based normative standards
**ed** = education-based normative standards
**e** = ethnicity-based normative standards
**g** = gender-based normative standards
**WNL** = within normal limits; **ACSS** = Age-corrected scaled score; **Raw** = Raw Score; **Standard** = Standard Score; **%tile** = percentile

| | |
|---|---|
| *Impaired:* | $\leq 1^{st}$ % |
| *Borderline:* | 2nd to 9th % |
| *Low Average:* | 10th to 24th % |
| *Average:* | 25th to 74th % |
| *High Average:* | 75th to 89th % |
| *Superior:* | 90th to 97th % |
| *Very Superior:* | $\geq 98^{th}$ % |

| Effort/Performance Validity | Raw | Description | Norms |
|---|---|---|---|
| Victoria Symptom Validity Test (VSVT) | | | |
|    Easy | 24/24 | Valid | VSVT Manual |
|    Difficult | 18/24 | Valid | |
|    Total | 42/48 | Valid | |
| Reliable Digit Span-Revised (for WAIS-IV) | 13 | WNL | Young et al, 2012 |
| Rey Fifteen Item Test | | | |
|    Recall | 15 | WNL | Boone et al. (2002) |
|    Recognition | 15 | | |
|    False Positives | 0 | | |
|    Effort Score | 30 | | |
| CVLT-II Forced Choice Recognition | 16/16 | WNL | Manual [a,g] |

| General Intellectual Function | Raw | Standard | %tile | Description | Norms |
|---|---|---|---|---|---|
| Test of Premorbid Functioning (TOPF) | 55 | 112 | 79 | High Average | ACS [a,ed,e,g] |
| Wechsler Adult Intelligence Scale, 4th Edition (WAIS-4) | | *t-score* | | | |
|    Block Design | 32 | 53 | 62 | Average | ACS [a,ed,e,g] |
|    Similarities | 33 | 75 | 99 | Very Superior | ACS [a,ed,e,g] |
|    Digit Span | 23 | 47 | 38 | Average | ACS [a,ed,e,g] |
|    Matrix Reasoning | 20 | 62 | 89 | High Average | ACS [a,ed,e,g] |
|    Vocabulary | 45 | 63 | 90 | Superior | ACS [a,ed,e,g] |
|    Arithmetic | 13 | 55 | 69 | Average | ACS [a,ed,e,g] |
|    Symbol Search | 18 | 36 | 8 | Borderline | ACS [a,ed,e,g] |
|    Visual Puzzles | 12 | 57 | 76 | High Average | ACS [a,ed,e,g] |
|    Information | 15 | 58 | 79 | High Average | ACS [a,ed,e,g] |
|    Coding | 39 | 34 | 6 | Borderline | ACS [a,ed,e,g] |
| | | *Composite* | | | |
|    Verbal Comprehension (sum SS) | 37 | 112 | 96 | Above Average | ACS [a,ed,e,g] |
|    Perceptual Reasoning (sum SS) | 29 | 98 | 82 | Above Average | ACS [a,ed,e,g] |
|    Working Memory (sum SS) | 17 | 92 | 54 | Average | ACS [a,ed,e,g] |
|    Processing Speed (sum SS) | 10 | 74 | 6 | Mild-Mod Impair | ACS [a,ed,e,g] |
|    Full-Scale IQ (FSIQ) | 93 | 95 | 73 | Average | ACS [a,ed,e,g] |
|    General Ability Index (GAI) | 66 | 105 | 95 | Above Average | ACS [a,ed,e,g] |

| Attention (Simple/Sustained/Divided) | Raw | T-Score | %tile | Description | |
|---|---|---|---|---|---|
| Trailmaking Test – Part A (0 errors) | 39" | 41 | 19 | Low Average | Heaton[a,e,ed,g] |
| Brief Test of Attention (BTA) | 14 | Z = -1.11 | 13 | Low Average | Manual[a] |
| Connor's Continuous Performance Test – 2nd Edition* | | | | | |
|    Omission Errors | 4 | 58 | 21 | inattention | |
|    Commission Errors | 14 | 58 | 20 | inattention | |
|    Hit RT | 543.6 | 74 | 1 | inattention | Computerized |
|    Hit RT Standard Error | 15.9 | 92 | 1 | inattention | Scoring |
|    Variability | 21.5 | 77 | 1 | inattention | Program |
|    Detectability | 0.4 | 63 | 8 | inattention | |
|    Hit RT ISI Change | .06 | 53 | 37 | Ok | |
|    Hit SE ISI Change | .15 | 69 | 3 | inattention | |
| WAIS-4 Arithmetic | 13 | 55 | 69 | Average | ACS[a,ed,g] |
| WAIS-4 Digit Span | 23 | 47 | 38 | Average | ACS[a,ed,g] |
| WAIS-4 Working Memory Composite | 92 | 51 | 54 | Average | ACS[a,ed,g] |

* CPT-2 percentiles reversed for interpretation consistency (i.e. lower t-score = better performance)

| Verbal Memory | Raw | Z-Score | % | Description | Norms |
|---|---|---|---|---|---|
| CVLT-II Total | 44 | T = 44 | 27 | Average | Manual[a,g] |
|   List A Trial 1 | 4 | -1.5 | 7 | Borderline | Manual[a,g] |
|     Trial 2 | 8 | -0.5 | 31 | Average | Manual[a,g] |
|     Trial 3 | 9 | -1.0 | 16 | Low Average | Manual[a,g] |
|     Trial 4 | 12 | 0 | 50 | Average | Manual[a,g] |
|     Trial 5 | 11 | -0.5 | 31 | Average | Manual[a,g] |
|   List B | 4 | -1.0 | 16 | Low Average | Manual[a,g] |
|   List A SD Free Recall | 7 | -1.5 | 7 | Borderline | Manual[a,g] |
|   List A SD Cued Recall | 10 | -1.0 | 16 | Low Average | Manual[a,g] |
|   List A LD Free Recall | 9 | -1.0 | 16 | Low Average | Manual[a,g] |
|   List A LD Cued Recall | 11 | -0.5 | 31 | Average | Manual[a,g] |
|   Semantic Clustering | 0.2 | -0.5 | 31 | Average | Manual[a,g] |
|   Recall Discriminability | 1.9 | -0.5 | 31 | Average | Manual[a,g] |
|   Total Learning Slope (T1-5) | 1.8 | 0.5 | 69 | Average | Manual[a,g] |
|   Across-Trial Consistency | 88 | 1.0 | 84 | High Average | Manual[a,g] |
|   Short-Delay Retention (SDFR vs T5) | -36% | -1.0 | 16 | Low Average | Manual[a,g] |
|   Long-Delay Retention (LD vs T5) | -18% | -0.5 | 31 | Average | Manual[a,g] |
|   Recognition Total Hits | 14 | -0.5 | 31 | Average | Manual[a,g] |
|   Recognition False Positives* (reverse) | 0 | 1.0 | 84 | High Average | Manual[a,g] |
|   Recognition Discriminability | 3.3 | 0.5 | 69 | Average | Manual[a,g] |
| | Raw | ACSS | %tile | Description | Norms |
| WMS-IV: Logical Memory, Immediate | 23 | 9 | 37 | Average | Manual[a] |
| WMS-IV: Logical Memory, Delayed | 19 | 9 | 37 | Average | Manual[a] |

| Non-Verbal Memory | Raw | T Score | %tile | Description | Norms |
|---|---|---|---|---|---|
| Brief Visuospatial Memory Test – R | | | | | |
|   Trial 1 | 4 | 40 | 16 | Low Average | Manual[a] |
|   Trial 2 | 6 | 37 | 10 | Low Average | Manual[a] |
|   Trial 3 | 7 | 34 | 5 | Borderline | Manual[a] |
|   Total Recall | 17 | 35 | 7 | Borderline | Manual[a] |
|   Learning | 3 | 43 | 34 | Average | Manual[a] |

| | | | | | |
|---|---|---|---|---|---|
| Delayed Recall | 7 | 38 | 12 | Low Average | Manual[a] |
| Percent Retained | 100 | | >16 | WNL | Manual[a] |
| Recognition Hits | 6 | | >16 | WNL | Manual[a] |
| Recognition False Positives | 0 | | >16 | WNL | Manual[a] |
| Recognition Response Bias | . 05 | | >16 | WNL | Manual[a] |
| Rey Osterreith Complex Figure | | | | | |
| Immediate Recall | 13.0 | 34 | 5 | Borderline | Manual[a] |
| Delayed Recall | 13.5 | 34 | 5 | Borderline | |

Mitrushina et al (2005) – metanalysis (Pag 786)

| Visual-Spatial Skills | Raw | T score | %tile | Description | Norms |
|---|---|---|---|---|---|
| WAIS-4: Block Design | 32 | 53 | 62 | Average | ACS [a,ed,e,g] |
| WAIS-4: Visual Puzzles | 12 | 57 | 76 | High Average | ACS [a,ed,e,g] |
| WAIS-4: Matrix Reasoning | 20 | 62 | 89 | High Average | ACS [a,ed,e,g] |
| WAIS-4: Percept Reasoning Composite | 98 | 59 | 82 | High Average | ACS [a,ed,e,g] |
| Rey-Osterreith Complex Figure, Copy | 28.5 | Z = -2.11 | 1 | Impaired | Mitrushina[a] |

*Mitrushina et al (2005) – metanalysis (Pag 783)

| Language Skills | Raw | T Score | %tile | Description | Norms |
|---|---|---|---|---|---|
| Boston Naming Test | 53 | 50 | 50 | Average | Heaton[a,e,e,g] |
| Verbal Fluency: F(14) + A(9) + S(13) | 36 | 48 | 42 | Average | Heaton[a,e,ed,g] |
| Verbal Fluency: Category | 17 | 49 | 46 | Average | Heaton[a,e,ed,g] |
| WAIS-4: Vocabulary | 45 | 63 | 90 | Superior | ACS [a,ed,e,g] |
| WAIS-4 Verbal Comprehension Composite | 112 | 68 | 96 | Superior | ACS [a,ed,e,g] |

| Motor and Psychomotor Speed | Raw | T Score | %tile | *Description* | Norms |
|---|---|---|---|---|---|
| Grooved Pegboard, Dominant | 85″ | 40 | 16 | Low Average | Heaton[a,e,e,g] |
| Grooved Pegboard, Non-Dominant | 99″ | 42 | 21 | Low Average | Heaton[a,e,ed,g] |
| Trail Making Test – A | 39″ | 41 | 19 | Low Average | Heaton[a,e,ed,g] |
| Verbal Fluency: F(14) + A(9) + S(13) | 36 | 48 | 42 | Average | Heaton[a,e,ed,g] |
| WAIS-4: Coding | 39 | 34 | 6 | Borderline | ACS [a,ed,e,g] |
| WAIS-4: Symbol Search | 18 | 36 | 8 | Borderline | ACS [a,ed,e,g] |
| WAIS-4: Processing Speed Composite | 74 | 34 | 6 | Borderline | ACS [a,ed,e,g] |
| Stroop Color Naming | 72″ | Z = -1.11 | 13 | Low Average | Demick & Harkins |
| Stroop Word Reading | 53″ | Z = -1.06 | 15 | Low Average | Demick & Harkins |

| Executive Functions | Raw | T Score | %tile | Description | Norms |
|---|---|---|---|---|---|
| Trail Making Test – B (0 errors) | 72″ | 53 | 63 | Average | Heaton[a,e,ed,g] |
| Verbal Fluency: F(14) + A(9) + S(13) | 36 | 48 | 42 | Average | Heaton[a,e,ed,g] |
| Brief Test of Attention (BTA) | 14 | Z = -1.11 | 13 | Low Average | Manual[a] |
| WAIS-4: Similarities | 33 | 75 | 99 | Very Superior | ACS [a,e,g] |
| WAIS-4: Arithmetic | 13 | 55 | 69 | Average | ACS [a,ed,e,g] |
| WAIS-4: Digit Span | 23 | 47 | 38 | Average | ACS [a,ed,e,g] |
| WAIS-4: Working Memory Composite | 92 | 51 | 54 | Average | ACS [a,ed,e,g] |
| Stroop Interference Trial | 140″ | Z = -1.72 | 4 | Borderline | Demick & Harkins |
| Wisconsin Card Sort Test –64 Card Version | | | | | |
| Total errors | 32 | 29 | 2 | Borderline | Heaton[a,ed,] |
| Perseverative Responses | 19 | 34 | 5 | Borderline | |
| Perseverative errors | 18 | 32 | 4 | Borderline | |
| Non-perseverative errors | 14 | 34 | 5 | Borderline | |

| Conceptual Level Responses | 17 | 27 | 1 | Impaired | |
| Categories Completed | 1 | | 6-10 | Borderline | |

| Emotion/Mood/Behavior | |
| --- | --- |
| | **Characterization** |
| **Beck Depression Inventory** | |
| Raw Score = 36 | Severe Depressive Symptoms |
| **Beck Anxiety Inventory** | |
| Raw Score = 47 | Severe Anxiety Symptoms |
| | |

# *FIBROMYALGIA MEDICAL OPINION*

From: _____

Re: __Lachanda Webb__ (Name of Patient)

___1/3/197I___ (Date of Birth)

Please answer the following questions concerning your patient's impairments:

1. Frequency and length of contact: _____

## FIBROMYALGIA QUESTIONS:

2. a. Does your patient meet the 1990 American College of Rheumatology Criteria for the Classification of Fibromyalgia (which includes tender point criteria)?
☑ Yes    ☐ No

b. If no, does your patient meet the 2010 American College of Rheumatology Preliminary Diagnostic Criteria for Fibromyalgia (which does not include tender point criteria)?
☐ Yes    ☐ No

3. Identify your patient's symptoms, signs and associated conditions:

| | |
|---|---|
| ☑ History of widespread pain > 3 months | ☑ Severe fatigue |
| ☑ 11 of 18 specific tender points – see page 3 | ☑ Depression |
| ☑ Cognitive dysfunction ("fibro fog") | ☑ Anxiety disorder |
| ☑ Irritable Bowel Syndrome | ☑ Waking unrefreshed |
| ☑ Muscle pain | ☑ Numbness or tingling |
| ☑ Muscle weakness | ☑ Abdominal pain/ cramps |
| ☑ Frequent severe headaches | ☑ Constipation |
| ☑ Dizziness | ☐ Nausea |
| ☐ Palpitations | ☐ Nervousness |
| ☐ Shortness of breath | ☑ Chest pain |
| ☐ Frequent urination | ☑ Blurred vision |
| ☑ Insomnia | ☐ Fever |
| ☑ Pain in upper abdomen | ☐ Diarrhea |
| ☐ Raynaud's Phenomenon | ☑ Dry mouth |
| ☐ Hives or welts | ☐ Itching |
| ☑ Ringing in the ears | ☐ Wheezing |
| ☐ Oral ulcers | ☐ Vomiting |
| ☐ Change in taste | ☐ Heartburn |
| ☐ Dry eyes | ☐ Loss of taste |
| ☐ Shortness of breath | ☐ Seizures |
| ☐ Loss of appetite | ☐ Sun sensitivity |
| ☐ Hearing difficulties | ☑ Easy bruising |
| ☐ Frequent urination | ☑ Hair loss |

From **Social Security Disability Practice** by Thomas E. Bush, copyright James Publishing. Used with permission. For information 800-440-4780 or www.JamesPublishing.com.

Symptoms, signs and associated conditions (continued):

| | | |
|---|---|---|
| ☐ Bladder spasms | ☐ | Interstitial cystitis |
| ☐ Irritable bladder syndrome | ☑ | Migraines |
| ☑ Gastroesophageal reflux disorder (GERD) | ☐ | Dysmenorrhea |
| ☑ Chronic Fatigue Syndrome | ☐ | Multiple Chemical Sensitivity |
| ☑ Restless leg syndrome | ☐ | Carpal Tunnel Syndrome |
| ☐ Temporomandibular Joint Disorder (TMJ) | ☐ | Panic attacks |
| ☐ Involuntary weight loss | ☑ | Malaise[1] |
| ☐ Other:_____ | | |

4. Other diagnosed impairments: ___Depression___

5. Were other disorders that could cause repeated manifestations of symptoms, signs or co-occurring conditions *excluded*? (Such disorders include rheumatologic disorders, myofascial pain syndrome, polymyalgia rheumatica, chronic Lyme disease, and cervical hyperextension-associated or hyperflexion-associated disorders.)
   ☑ Yes        ☐ No

6.  a. Identify the location of pain including, where appropriate, an indication of right or left side or bilateral areas affected:

| | RIGHT | LEFT | BILATERAL |
|---|:---:|:---:|:---:|
| ☐ Lumbosacral spine | | | |
| ☐ Cervical spine | | | |
| ☐ Thoracic spine | | | |
| ☐ Chest | | | |
| ☐ Shoulders | ☐ | ☐ | ☑ |
| ☐ Arms | ☐ | ☐ | ☑ |
| ☐ Hands/fingers | ☐ | ☐ | ☑ |
| ☐ Hips | ☐ | ☐ | ☑ |
| ☐ Legs | ☐ | ☐ | ☑ |
| ☐ Knees/ankles/feet | ☐ | ☐ | ☑ |

   b. Describe the nature, frequency, and severity of your patient's pain:

[1] Malaise is defined as frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function.

2

WEBB APL - 041

c. Identify any factors that precipitate pain:

☑ Changing weather ☑ Fatigue ☑ Movement/Overuse ☑ Cold
☑ Hormonal Changes ☐ Stress ☑ Sleep problems ☑ Static Position

7. Do emotional factors contribute to the severity of your patient's symptoms and functional limitations?          ☑ Yes          ☐ No

8. Circle your patient's tender points:



**Tender Point Sites**

Occiput — Low Cervical — Trapezius — Second Rib — Supraspinatus — Lateral Epicondyle — Gluteal — Greater Trochanter — Knee

**Back View**          **Front View**

9. Describe the treatment and response including any side effects of medication that may have implications for working, *e.g.*, drowsiness, dizziness, nausea, etc.:

_____

_____

10. Prognosis: _____

11. Has your patient's fibromyalgia lasted or can it be expected to last at least twelve months?          ☑ Yes          ☐ No

3

**CHRONIC FATIGUE SYNDROME QUESTIONS:**

12. Does your patient have Chronic Fatigue Syndrome?    ☑ Yes    ☐ No

13. Does your patient have unexplained persistent or relapsing chronic fatigue that is of new or *definite* onset (has not been lifelong), is not the result of ongoing exertion, and results in substantial reduction in previous levels of occupational, educational, social, or personal activities?    ☑ Yes    ☐ No

If yes, please describe your patient's history of fatigue.

*Insomnia w/ severe pain + lack of sleep leading to fatigue*

14. Have you been able to exclude any other impairments as a cause for your patient's fatigue such as HIV-AIDS, malignancy, parasitic disease (Lyme Disease), psychiatric disease, rheumatoid arthritis, drug or alcohol addiction or abuse, side effects of medications, etc.?    ☑ Yes    ☐ No

If yes, identify which impairments you have excluded and on what basis.

*patient does have anxiety + depression*

15. Does your patient have concurrent occurrence of four or more of the following symptoms that persisted or recurred during six or more consecutive months of illness and did not predate the fatigue?    ☑ Yes    ☐ No

If yes, identify the symptoms:

☑    Post-exertional malaise lasting more than 24 hours;

☑    Self-reported impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social or personal activities:

☐    Sore throat;

4

N/A

☑ Tender cervical or axillary lymph nodes;
☑ Muscle pain;
☑ Multiple joint pain without joint swelling or redness;
☑ ~~Headaches of a new type, pattern or severity;~~
☑ Unrefreshing sleep.

16. Indicate which, if any, of the following additional symptoms are present:

☑ Muscle weakness;
☑ Disturbed sleep patterns (for example, insomnia, prolonged sleeping, frequent awakenings, or vivid dreams or nightmares);

☑ Visual difficulties (for example, trouble focusing, impaired depth perception, severe photosensitivity, or eye pain);

☑ Orthostatic intolerance (for example, lightheadedness, fainting, dizziness, or increased fatigue with prolonged standing);

☐ Respiratory difficulties (for example, labored breathing or sudden breathlessness);

☐ Cardiovascular abnormalities (for example, palpitations with or without cardiac arrhythmias);

☑ Gastrointestinal discomfort (for example, nausea, bloating, or abdominal pain); and

☑ Urinary or bladder problems (for example, urinary frequency, nocturia, dysuria, or pain in the bladder region).

17. Indicate which, if any, of the following are present:

☐ Fever; ☐ Involuntary weight loss; ☑ Malaise (defined as frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function).

18. Indicate which, if any, of the following medical signs have been clinically documented over a period of at least six consecutive months:

☐ Palpably swollen or tender lymph nodes on physical examination;
☐ Nonexudative pharyngitis;
☐ Persistent reproducible muscle tenderness on repeated examinations, including the presence of positive tender points.

5

WEBB APL - 044

List any other medical signs that are consistent with medically acceptable clinical practice and are consistent with other evidence in the case record including frequent viral infections with prolonged recovery; sinusitis; ataxia; extreme pallor; and pronounced weight change:

_____

_____

_____

19.   Indicate which, if any, of the following laboratory findings are present:

☐   An elevated antibody titer to Epstein-Barr virus (EBV) capsid antigen equal to or greater than 1:5120, or early antigen equal to or greater than 1:640;

☐   An abnormal magnetic resonance imaging (MRI) brain scan;   MRI brain 2018 normal

☐   Neurally mediated hypotension as shown by tilt table testing or another clinically accepted form of testing.

List any other laboratory findings that are consistent with medically accepted clinical practice and are consistent with other evidence in the case record; for example, an abnormal exercise stress test or abnormal sleep studies, appropriately evaluated and consistent with the other evidence in the case record:

_____

_____

20.   Indicate which, if any, of the following mental findings have been documented by mental status examination or psychological testing:

☑ Short term memory deficit            ☑ Information processing limitations
☐ Visual-spatial difficulties          ☑ Comprehension problems
☑ Concentration limitations            ☑ Anxiety
☑ Depression
     Identify any other mental findings suggesting persisting neurocognitive impairment:

21.   As a result of your patient's impairments, estimate your patient's functional limitations if your patient were placed in a *competitive work situation*.

     a.   Does your patient have the stamina and endurance to work an easy job 8 hours per day 5 days per week (with normal breaks every two hours)?
                                        ☐ Yes        ☒ No

6

If no, please explain the reasons for your conclusion: severe fatigue + diffuse pain / Fibro fog.

b. Does your patient need a job that permits shifting positions *at will* from sitting, standing or walking?  ☐ Yes  ☐ No  cannot work

c. Does your patient need to include periods of walking around during an 8-hour working day?  ☐ Yes  ☐ No  cannot work

   1)   If yes, approximately how *often* must your patient walk?

   1  5  10  15  20  30  45  60  90
   Minutes

   2)   How *long* must your patient walk each time?

   1 2 3 4 5 6 7 8 9 10 11 12 13 14 15
   Minutes

d. In addition to normal breaks every two hours, will your patient sometimes need to take *unscheduled* breaks during a working day?  ☒ Yes  ☐ No  Technically cannot work

   If yes,  1) approx. how *often* do you think this will happen? every 2 hour

   2) approx. how *long* (on average) will each break last? 15 min

   3) what symptoms cause a need for breaks?
      ☐ Muscle weakness   ☐ Pain/ paresthesias, numbness
      ☐ Chronic fatigue   ☐ Adverse effects of medication
      ☐ Other: _____

e. With prolonged sitting, should your patient's leg(s) be elevated?  ☒ Yes  ☐ No

   If yes,  1) how *high* should the leg(s) be elevated?  1-2 feet.

   2) if your patient had a sedentary job, *what percentage of time* during an 8-hour working day should the leg(s) be elevated?  50 %

   3) what symptoms cause a need to elevate leg(s)?  pain / leg swelling

f. Does your patient have significant limitations with reaching, handling or fingering?  ☐ Yes  ☐ No

If yes, please indicate the percentage of time during an 8-hour working day that your patient can use hands/fingers/arms for the following activities:

7

|  | HANDS:<br>Grasp, Turn<br>Twist Objects | FINGERS:<br>Fine<br>Manipulations | ARMS:<br>Reaching<br>In Front of Body | ARMS:<br>Reaching<br>Overhead |
|---|---|---|---|---|
| **Right:** | % | % | % | % |
| **Left:** | % | % | % | % |

g. How much is your patient likely to be *"off task"*? That is, what percentage of a typical workday would your patient's symptoms likely be severe enough to interfere with *attention and concentration* needed to perform even simple work tasks?

☐ 0%  ☐ 5%  ☐ 10%  ☐ 15%  ☐ 20%  ☒ 25% or more

h. To what degree can your patient tolerate work stress?

☒ Incapable of even "low stress" work ☐ Capable of low stress work
☐ Capable of moderate stress - normal work ☐ Capable of high stress work

i. Are your patient's impairments likely to produce "good days" and "bad days"?

☒ Yes  ☐ No

If yes, assuming your patient was trying to work full time please estimate, on the average, how many days per month your patient is likely to be absent from work as a result of the impairments:

☐ Never ☐ About three days per month
☐ About one day per month ☐ About four days per month
☐ About two days per month ☒ More than four days per month

j. Indicate to what degree the following functional limitations exist as a result of your patient's impairments. *Note:* **Marked** means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately, effectively, and on a sustained basis.

marked limitation due to pain
N/A.

8

| FUNCTIONAL LIMITATION | | | | | |
|---|---|---|---|---|---|
| A. | Limitation of activities of daily living | None or Mild | (Moderate) | Marked | Extreme |
| B. | Limitation in maintaining social functioning | None or Mild | Moderate | (Marked) | Extreme |
| C. | Limitation in completing tasks in a timely manner due to deficiencies in concen-tration, persistence or pace | None or Mild | Moderate | (Marked) | Extreme |

22. Are your patient's impairments (physical impairments plus any emotional impairments) as demonstrated by signs, clinical findings and laboratory or test results **reasonably consistent** with the symptoms and functional limitations described above in this evaluation?

☑ Yes   ☐ No

If no, please explain: _____

23. Please describe any other limitations (such as psychological limitations, limited vision, difficulty hearing, need to avoid temperature extremes, wetness, humidity, noise, dust, fumes, gases or hazards, etc.) that would affect your patient's ability to work at a regular job on a sustained basis:

Has migraines so during episodes best to avoid light + sounds. Stress triggers her condition

Date: 10/14/20

7-33
7/16
§231.3

Print/Type Name: Geraldine Navarro
Signature: Geraldine Navarro
Address: 27235 Tourney Rd 2500
Valencia, CA 91355

9

WEBB APL - 048

## DECLARATION OF LACHANDA WEBB

I, LaChanda Webb, declare as follows:

1.      I have reviewed the letter to UNUM drafted on my behalf by Kantor & Kantor dated March 10, 2021.

2.      To the best of my knowledge and recollection, all information shared within this letter is completely accurate.

3.      Specifically, I had no knowledge or awareness of the nature or importance of neuropsychological testing or any other objective testing during the claim process beyond what my physicians explained to me in the context of treating my illness.

4.      I was never informed about neuropsychological testing by my own physicians. I presume the request for such testing was denied by my insurance, if such a request was indeed made.

5.      Even if I had known about such testing, I would not have been able to afford it, as UNUM terminated my only source of income. I am now informed and believe that the testing costs between $3500 and $6500. This is something I could have never afforded.

6.      Due to the severity of my fatigue and cognitive impairments, even if I had been able to afford such testing, I would not have been able to arrange it without assistance.

I declare under penalty, that the foregoing is true and correct.  Executed on March 10, 2021, at 5:28 P.M, Santa Clarita, California.

LaChanda Webb

## Millie Schwam

| | |
|---|---|
| **From:** | Concord Fax <ctnotify@concord.net> |
| **Sent:** | Thursday, March 11, 2021 9:39 AM |
| **To:** | Millie Schwam |
| **Subject:** | SUCCESS: Your 55 page fax has been successfully delivered to +12075752354. |



# Success

Your 55 page fax has been successfully delivered to +12075752354 on 03/11/2021 9:37 AM.

| | |
|---|---|
| Tracking Number: | 707-6269721 |
| Fax Number: | +12075752354 |
| Recipient: | 12075752354 |
| Subject: | LaChanda Webb |
| Time Delivered: | 03/11/2021 9:37 AM |
| Pages Delivered: | 55 |

You can check the status of your faxes and review your account activity by logging in at
https://portal.concordfax.com



Documentation


Product Information


Concord Web Portal


Video Tutorials



*This is a system generated message, please do not reply.

**USPS TRACKING #**

9590 9402 6371 0303 3402 28

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

Kantor & Kantor, LLP
19839 Nordhoff Street
Northridge, CA 91324

Attn: Millu S.



Webb

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Katie Doherty HIA
Lead Appeals Specialist
Unum- Appeals Unit
PO Box 9548
Portland, ME 04104-5058

9590 9402 6371 0303 3402 28

2. Article Number *(Transfer from service label)*

7020 1810 0001 8964 8160

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
Travis Vaughn
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*
Travis Vaughn
C. Date of Delivery
MAR 18 2021

RECEIVED

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

MAR 23 2021

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053

Domestic Return Receipt

# EXHIBIT C



**The Benefits Center Claims Manual**

Confidential and Proprietary Information – Authorized Use Only – Do Not Print or Copy

# Appeal Procedures

**In this document:**

Applicability

Policy

Procedure

    Appeal Rights and Appeal Text (N/A to SI Plans and Standalone Non-ERISA IDI Claims)
        State-Specific Appeal Text

    What is Considered an Appeal?
    Appeal Units and Appeal Communications
        ERISA Claims Filed Prior to 1/1/2002 and ALL Non-ERISA Appeals

        Claims Filed on and After 1/1/2002

    Possible Appeal Outcomes
    Late Appeals on Adverse Decisions
        For ERISA Claims and VB Claims

        For Non-ERISA Claims

    Information Received Post-Appeal Decision
        For ERISA, Non-ERISA and VB Claims

    Reference

# Applicability

STD (FI/SI), LTD (FI/SI), IDI, Group Life, LWOP, AD&D, LTC, All VB products

For standalone non-ERISA IDI claims, see Appeals and Reevaluations - Standalone Non-ERISA IDI.



For the purposes of this procedure, when the term "claimant" is used, it can also mean "beneficiary" unless otherwise noted.

Top ▲

## Policy

An appeal is a written communication from a claimant or the claimant's authorized representative that requests a review of a final claim decision made by the DBS.

Unum is committed to thorough, fair and accurate claims evaluations and decision-making.  ERISA extends the right to appeal a claim decision to beneficiaries of ERISA plans.  As a service to non-ERISA claimants, Unum offers those claimants the option to appeal the claim decision as well.  This opportunity for an appeal extends to each of Unum's product lines and claims operations.  In the handling of these appeals, Unum further complies with each of the applicable substantive and procedural requirements in ERISA or state laws, if applicable.

ERISA further mandates, with a few specific exceptions, that a participant must exhaust (i.e., utilize and complete) this appeal process before s/he may take further legal action (for example, a lawsuit against the plan or its insurer based on the denial of benefits).  If the participant fails to exhaust his/her right of appeal prior to a lawsuit, the court may consider that lawsuit premature and dismiss it.  ERISA further sets forth specific time frames in which a participant must submit an appeal, and the plan, or its representative, must decide that appeal.

In compliance with ERISA and all other applicable laws and regulations, Company personnel (including but not limited to claims handling personnel) will not interfere with nor attempt in any way to influence appeal personnel involved with the separate appeal process following the denial of benefits or termination of any claim.  This requirement should be followed regardless of the product or the date the claim was filed.

**Reminder:  Each claim is unique and should be evaluated on its own merits.  The actual policy governing the claim must be referenced.**



Top ▲

## Procedure

### Appeal Rights and Appeal Text (N/A to SI Plans and Standalone Non-ERISA IDI Claims)

We will provide an opportunity to appeal and will notify our claimants using appeal text when:

- we make an adverse claim decision (including suspending benefits); and/or
- a claimant requests a review of part or all of a claim decision.

Appeal text is not required when:

- we determine that a claimant is not eligible for a particular supplemental benefit feature or rider unless:
  - the claimant or beneficiary requests a review of our determination; and
  - our determination involves questions of interpretation rather than solely questions of fact.  For example, a claimant is not entitled to a child care benefit if s/he is does not have a child; this is a question of fact and not interpretation.
- a residual claim is open but not payable for a period because the claimant has too much income for that period, unless the claimant requests a review of our determination.
- the claim is open but no benefits are payable because the claimant is incarcerated, unless the claimant requests a review of our determination; however, if incarceration is an exclusion and the claim is denied or closed on that basis, then appeal rights will be provided when the adverse decision is made.  See Incarceration and Benefit Payments.
- the claim is open but we stop paying or reduce a social insurance rider benefit; unless the claimant requests a review of our determination.



- the claim is closed as a result of death or reaching the maximum duration of the policy, unless there is a dispute regarding the final date or payment amount.

- a claimant or PH requests that a claim be withdrawn.  See Claim Withdrawal.

See also Suspension of Benefits.


**State-Specific Appeal Text**


For FI STD, FI LTD, IDI common claims, standalone IDI ERISA claims, Group Life, LTC, LWOP, AD&D and VB claims only: several states have established requirements regarding letter language.  Letters for claimants residing in these states, or in some cases letters related to policies sitused in those states, must include the state-specific language in addition to the appropriate appeal text.  As a result, we have state-specific appeal text for CA, IL, MD, NE, NH, NJ, NY, RI, SD and WV that also includes the standard ERISA, non-ERISA or VB appeal language.


For those VB non-disability policies that do not include a provision outlining the time frame in which the insured can take legal action, we have specific "Without Legal Action" appeal text for CA, NJ and NY.


See Maryland - Disability Claim and Appeal Regulations for more information about MD appeal regulations.

For SI STD and SI LTD only: while SI plans are subject to federal law such as ERISA, ADA and FMLA (among others), they are not subject to state insurance law because they do not involve policies of insurance.  Since state DOIs have no authority over SI plans, when writing an adverse claim decision letter on an SI claim do not include a state-specific appeal paragraph.  If the claimant resides in one of the states listed above, include the standard ERISA or non-ERISA appeal text (whichever is applicable).


Top ▲


# What is Considered an Appeal?


Certain communications from the claimant or other individuals are considered appeals, while others are not.



| If: | Is this an Appeal? | Next Steps: |
|---|---|---|
| the claimant calls us to request a review of a final claim decision | No.  Appeals must be in writing. | Advise the claimant that s/he needs to submit a written appeal in order for us to review his/her request.  This appeal should include any documentation, such as additional medical records, employment records etc., which s/he believes will support his/her appeal. |
| a written request for review of the final claim decision is submitted by an individual other than the claimant or his/her attorney | No.  This is not considered an appeal without a written *Authorization* from the claimant that the requestor is acting on his/her behalf. | The person submitting the request should be advised that we require a written *Authorization* from the claimant or his/her representative. |
| the claimant contacts us electronically via iServices to request a review of a final claim decision | Yes. | Occasionally, a claimant who has web-based access to his/her claim through iServices may use this method to submit an appeal.  When the appeal is submitted, an NL activity is generated and sent to the claim owner.  Immediately forward any NL activity requesting an appeal to the Appeals department for processing. |
| the claimant e-mails us directly to request a review of a final claim decision | Yes. | PTI the e-mail and add to the NL claim file.  Send an NL activity to the Appeals department for processing.  Advise the claimant that you have forwarded the appeal request to the Appeals department for processing.<br><br>If you have reason to believe that the e-mail did not actually come from the claimant, consult with your DLR before forwarding to the Appeals department for processing. |

Top ▲



## Appeal Units and Appeal Communications

To conduct, manage, evaluate and decide appeals, Unum maintains separate appeals units in 3 of its locations: Chattanooga, Portland and Worcester.  These appeals units provide an independent review of any claim decision that the claimant appeals.  When an appeal is received by the Company, it is assigned to an Appeals professional for review.  During the appellate review, this individual should call the claimant or the claimant's legal representative.

If a BC claims unit receives an appeal, immediately forward it to Appeals.  Do not send paper appeals to Intake for BES.  If the appeal is not submitted to Appeals within 3 business days, the BC claims unit that received the appeal must send an appeal acknowledgment letter within 3 business days of appeal receipt.

**ERISA Claims Filed Prior to 1/1/2002 and ALL Non-ERISA Appeals**

| If the claimant's appeal: | Then: |
|---|---|
| contains new information | the Appeals Specialist may:<br><br>- send an acknowledgment letter to the claimant and make a decision on the appeal, or<br>- send an acknowledgement letter to the claimant advising the new information is being returned for review by the BC.<br><br>Benefits should complete the review of the new information within 30 days.<br><br>- If the claim decision is overturned, Benefits will re-open the claim in accordance with Reopening a Claim.<br>- If the claim decision is upheld, Benefits will:<br>  - send the file and appeal to Appeals for assignment to |

|  | an Appeals Specialist;<br><br>○ communicate to the claimant in writing the fact that the denial decision is upheld, the rationale for the decision, and that the file is being sent to Appeals for review.<br><br>• If the review is not completed within 30 days, Benefits will contact Appeals to advise of the reason for the delay and provide the claimant with a status update. |
|---|---|
| does not include new information | the appeal will be assigned to an Appeals Specialist for review. |

**Claims Filed on and After 1/1/2002**

- For ERISA and VB Disability only: appeals will be assigned to an Appeals Specialist for review.  Claims that arrive with new information will be reviewed in Appeals for appropriate action.

- For non-ERISA and non-VB Disability only: Follow the process outlined above for ERISA Claims Filed Prior to 1/1/2002.  Non-ERISA appeal text provides a 180-day appeal period, regardless of the date the claim was filed.

Top ▲

## Possible Appeal Outcomes

There are several possible outcomes from the independent review and evaluation of claim appeals:

- The claim decision is upheld.

- The claimant provides new information on appeal which warrants the claim being returned to the specific claim unit from which the claim originated for further investigation.

- The claimant provides new information on appeal which warrants the claim being paid and returned to the applicable claim unit for further handling.

- The claim decision is reversed and sent back to the applicable claim unit for further handling.



- The claim dispute is resolved.

The relevant and persuasive facts determine what the appropriate outcome should be on appeal.

Top ▲

## Late Appeals on Adverse Decisions

**For ERISA Claims and VB Claims**

Under ERISA and our guidelines, the claimant is required to submit an appeal within a certain number of days following receipt of a written adverse decision.  The Appeals unit will determine whether or not the appeal should be reviewed or whether it will be declined as being late.  The only communication with the claimant should be through the Appeals unit.

- **Claims filed PRIOR to 1/1/2002 and all Group Life, AD&D and VB non-Disability claims filed regardless of date:**  An appeal will be considered "late" if the appeal letter is received more than 100 days from the date of our adverse decision letter.  ERISA regulations provide 60 days to submit the appeal; but we have administratively extended this to 90 days from receipt of this letter; we allow an additional 10 days for mailing time.

- **Claims filed ON or AFTER 1/1/2002 (all products except Group Life, AD&D and the following VB products:  GACC, Hospital Confinement, Cancer, CI, GHI, HSBR/Wellness, Life, LWOP, MedSupport):**  An appeal will be considered "late" if the appeal letter is received more than 190 days from the date of our adverse decision letter.  ERISA regulations provide 180 days to submit the appeal; we allow an additional 10 days for mailing time.

If an appeal is submitted late and is received by the DBS, it should be immediately forwarded to Appeals for response.

If a call is received on a claim after the appeal deadline, advise the claimant that it appears any appeal would be late, but s/he can make a written appeal to the Appeals unit if desired.



If additional information is submitted after the appeal period (i.e., it is submitted late) without an appeal, it should be treated as a late appeal and submitted to Appeals for response.

**For Non-ERISA Claims**

Absent a state statute or regulation to the contrary, for non-ERISA plans, the Company asks, but does not require, the appeal letter to be received within the same 180 days that the Company requires for ERISA claims.

| If: | Then: |
|---|---|
| an appeal is submitted under a non-ERISA plan, regardless of the length of time from the adverse decision letter | • refer it to Appeals for review, and<br>• do not indicate to the claimant that the appeal is "late." |
| new information is submitted without an appeal | • the new information should be reviewed by the DBS, and<br>• the claim should not be referred to Appeals. |
| a claimant calls and wants to appeal after the stated time frame | advise the claimant to submit a written appeal to Appeals. |

Top ▲

## Information Received Post-Appeal Decision

If an appeal has already been completed for a claim, refer any subsequent correspondence on the same claim to Appeals for handling.  As a general rule, all post appeal information should be added to the claim file.

Occasionally, we will re-review a claim decision after the completion of the appeal process provided for under ERISA.  Such a re-review is provided as an added customer service.  Re-reviews are not available



where Unum is administering SI plans under an ASO agreement that does not delegate to Unum complete discretionary authority to determine whether the claim is payable.

**For ERISA, Non-ERISA and VB Claims**

Whether the information will be considered depends on whether a re-review will occur.

| If the appellate review: | And: | Then: |
|---|---|---|
| was concluded | no additional information was deemed necessary | the appeal decision will not be reviewed and the information will not be considered. |
| determined that additional information was needed to reach a decision | the claimant provided the additional information within the fixed period of time allotted by the Appeals Specialist | the appeal decision will be reviewed and the information will be considered. |
| determined that additional information was needed to reach a decision | the claimant did not provide the additional information before the deadline set by the Appeals Specialist | the appeal decision will not be reviewed and the information will not be considered. |
| was completed and no additional information was deemed necessary | the claimant provided additional information that we were not previously aware of | the Appeals Specialist should discuss the additional information with his/her QCC/director to determine whether or not the appeal decision should be reviewed. |

Top ▲

## Reference

Please refer any questions to your manager.



**Procedure**

- Appeals and Reevaluations - Standalone Non-ERISA IDI
- California Regulations
- Claim Withdrawal
- Communicating Adverse Claim Decisions
- Determining ERISA Applicability
- Electronic Claim Communication
- ERISA: Disability and LWOP Appeal Time Frames
- ERISA: Disability and LWOP Initial Claim Time Frames
- ERISA: Group Life, AD&D and LTC Appeal Time Frames
- ERISA: Group Life, AD&D and LTC Initial Claim Time Frames
- Illinois Regulations
- Incarceration and Benefit Payments
- Maryland - Disability Claim and Appeal Regulations
- Maryland Regulations
- Nebraska Regulations
- New Hampshire Regulations
- New Jersey Regulations
- New York Regulations
- Oregon Regulations
- Releasing Claim File Information to the Claimant
- Reopening a Claim
- Rhode Island Regulations
- South Dakota Regulations
- Suspension of Benefits
- VB Disability and VB LWOP Appeal Time Frames
- VB Disability and VB LWOP Initial Claim Time Frames



- [VB Non-Disability Appeal Time Frames](#)

- [VB Non-Disability Initial Claim Time Frames](#)

- [West Virginia Regulations](#)

- [Wisconsin Independent Review of Pre-Existing Condition Denials and Rescissions](#)

**BC Learning & Reference**

- [Appeals](#)
- [ERISA - Disability & LWOP Claims](#)
- [ERISA - Group Life, AD&D and LTC Claims](#)
- [New Information without Appeal - LTC](#)

**Other**

- [Benefit Features](#)
- [Common Claim-IDI Only Appeal Text](#)
- [Common Claim-IDI-LTD Appeal Text](#)
- [Group Life/AD&D ERISA Appeal Text](#)
- [Group Life/AD&D Non-ERISA Appeal Text](#)
- [IDI ERISA Appeal Text](#)
- [IDI Non-ERISA Appeal Text](#)
- [LTC Appeal Text](#)
- [LTD/LWOP ERISA Appeal Text-Claim Filed On or After 1-1-2002](#)
- [LTD/LWOP ERISA Appeal Text-Claim Filed Prior to 1-1-2002](#)
- [LTD/LWOP Non-ERISA Appeal Text](#)
- [STD ERISA Appeal Text](#)
- [STD Non-ERISA Appeal Text](#)
- [VB Disability Appeal Text](#)



- [VB Non-Disability Appeal Text](#)

[Top ▲](#)